JOHN W. MOORE

*v.*

JOHNSON SERVICE COMPANY, *a corporation*

(No. 13201)

Decided May 27, 1975.

*W. E. Mohler* for appellant.

*Albert F. Good, Bibby & Good* for appellee.

HADEN, CHIEF JUSTICE:

This is an appeal and supersedeas by Johnson Service Company, a Wisconsin corporation, awarded by this Court to a final order of the Circuit Court of Kanawha County granting declaratory relief, a money judgment of $880.76 and statutory costs to John W. Moore, a landlord, under a certain lease agreement in which the Company

was the tenant. In this Court, Moore cross-assigned error to the ruling of the trial court denying him reasonable attorney fees allowable under certain conditions contained in the lease agreement between the parties.

Moore and the Company entered into a lease dated April 7, 1967. Subsequently, the parties executed two addenda and a "rider" dated May 12, 1967 in modification of the original agreement, all covering the demise of certain commercial premises to be constructed by Moore, containing 4,052 square feet of floor space and 1,551 square feet of parking space, located in South Charleston, West Virginia. The term of the lease was for ten years, commencing November 15, 1967. The lessee Company prepared the lease instruments.

The controversy which engendered this litigation arose due to the increase in real estate taxes resulting from the increase in assessed value of the demised property coincident with the completion of improvements on the property done to make it suitable for the Company's commercial purposes.

Pursuant to the lease, Moore was to be responsible for the preexisting real estate tax base, but according to a tax escalation clause contained in the rider agreement, the Company would be responsible for the payment of increased taxes, ascertainable as follows:

> "... Lessee agrees to pay the Lessor any increase in amount of real property taxes over the full first year's assessment which may be paid by the Lessor for the subsequent years of the lease term."

Real property taxes on the demised property for the year 1968 amounted to $123.20 and for the following calendar year of 1969 amounted to $1,003.96.

Moore tendered a statement to the Company in an amount of $880.76 for the excess of the 1969 real estate taxes over the 1968 taxes. The Company refused to pay the excess figure and contended that the foregoing tax escalation clause as it referred to the "full first year's

assessment" meant the calendar year 1969 and that the Company's liability for excess taxes, if any, should be computed upon a comparison of the 1970 real estate taxes with the 1969 real estate taxes.

When it became apparent that the parties were unable to agree on the meaning of the clause in relation to the real estate taxes levied, Moore instituted a civil action against the Company seeking a declaration of the parties' rights under the tax escalation clause in the lease agreement, seeking a money judgment for "the excess 1969 real estate taxes" and also seeking a recovery for reasonable attorney fees as provided under the terms of the lease, as follows:

"6. Parties Mutually Covenant

\* \* \*

"3. In the event that either party hereto shall be successful in enforcing against the other any remedy, legal or equitable, for a breach of any of the provisions of this lease, there shall be included in the judgment or decree the reasonable expense and attorneys' fees of the successful party."

Upon these facts, the trial court made certain findings of facts and conclusions of law, and ruled in favor of Moore that the Company was (1) liable to Moore for that part of the real estate taxes paid by Moore, or to be payable by Moore, exceeding the sum of $123.20 for the years 1969 through and including the calendar year 1976 and on a 5/6 pro rata basis for that part of the real estate taxes payable by Moore for the calendar year 1977 exceeding the sum of $123.20; (2) granted the plaintiff's request for a monetary judgment in the sum of $880.76 for the excess 1969 calendar year property taxes over those paid in the calendar year 1968; and (3) statutory costs of the civil action. The trial court also ruled in favor of the Company and held that Moore was not entitled to reasonable attorney fees as provided for in the lease because such were not items of recovery permitted under the law of this jurisdiction.

Two legal issues are presented for resolution: First, whether the trial court was correct in its interpretation of the lease and its determination that the "full first year's assessment" referred to the first calendar year after the commencement of the lease term. Secondly, whether public policy permits recovery of reasonable attorney fees upon contingencies provided for by consenting parties to a written lease agreement.

The first issue encompasses three assignments of error: first, that the trial court erred in finding that the phrase "full first year's assessment" had no established legal meaning and was "patently ambiguous"; second, that the trial court erred in attempting to construe the questioned phrase in light of the words employed in the context of the whole instrument; and third, that the trial court erred in holding that the questioned phrase was intended to refer to the next ensuing tax year, rather than "meaning what it clearly said."

Individually, the words comprising the phrase "full first year's assessment" convey reasonably definitive thoughts. In their combined form, however, the same words create considerable confusion. The modifiers—"full first year's"—are words of common usage which, separately or collectively, require little or no explanation to discern their intended meaning. Similarly, the word "assessment", when used in the parlance of property taxation, ordinarily imparts a well-defined meaning. *See,* 84 C.J.S. *Taxation* § 391 (1954). The composite phrase here presented does not explain itself without resort to construction.

Although variously defined, "assessment", in its technical sense, generally refers to "The listing and valuation of property for the purpose of proportioning a tax upon it, either according to value alone or in proportion to benefit received." *Black's Law Dictionary* 4th Ed. (1951) at 150. As recognized in *Breckenridge v. County School Board,* 146 Va. 1, 135 S.E. 693 (1926):

> "An assessment consists in listing the property and putting a value thereon to which the rate fixed by the levy is to be applied." *Id.* at 695.

Accord, *Sussex County v. Jarratt*, 129 Va. 672, 106 S.E. 384 (1921); *Hilliard on Taxation* (1875) at 291.

In *George S. Hazelwood Company v. Pitsenbarger, Assessor*, 149 W. Va. 485, 141 S.E.2d 314 (1965), decided after the 1961 amendment of *W. Va. Code* 1931, 11-3-1 changed the assessment date for non-utility property, it was held:

> "... [Property] may acquire a tax situs and be assessed on any day fixed by the Legislature; and the tax is determined thereby, even though the property is removed from the state before the tax is due or even before it has actually been assessed." Part *syllabus* point 2., *id.*

> "All property in West Virginia is assessed annually on the first day of July against the owner of the property at that time, but the personal property must be located in the state each year at the time it is assessed." *syllabus point* 5., *id.*

Thus, in this State, all non-utility property is "assessed" as of one particular day, the first day of July, even though the actual mechanics of the assessment procedure are likely to occur subsequent to that date.

The statute itself, *W. Va. Code* 1931, 11-3-1, as amended, furnishes further illustration of the technical significance of the term "assessment." It provides that all property shall be assessed annually at its true and actual value "as of " the first day of July. It does not require, as counsel for appellant contends, that property be assessed "on" that day.

The resulting distinction is apparent and material; the "assessment" date, in the technical sense, constitutes a fixed reference to a particular day upon which ownership and value are to be ascertained for future levy, and not to either the actual mechanics of the assessment procedure or to the initiatory day for the corresponding tax obligation. The technical distinction thus reveals the inherent ambiguity within the phrase, "full first year's assessment" as it relates to the law. The modifiers— "full first year's"—connote a span of time which seemingly suggests the levy or tax period which follows the

assessment date, whereas "assessment" refers to the particular day fixed by the Legislature upon which ownership and value shall be ascertained for the subsequent application of the levy. Hence, the purported certainty of the word "assessment", as a term of art, is materially obscured by its modifiers when compared with the statutory scheme of assessment and levy.

Even in statutory parlance, the term "assessment" does not connote a single concept. As is said in 84 C.J.S., *Taxation* § 391 (1954):

> "The word 'assess' has a broad or narrow meaning, according to sense or connotation in which it is used. The narrow meaning usually is limited to the listing and valuing of property for taxation; in its broadest sense, the term includes the entire process of listing, valuing, levying, and extending the tax on the rolls. So, the term ·is used at times to include all the steps involved in imposing a tax on property." *Id.* at 750.

See also, Black's Law Dictionary, 4th Ed., "Assessment" (1951). In this context, we observe that in the State of Wisconsin, where this agreement apparently was prepared, the word "assessment" has been a source of some consternation. In *Prentice v. Ashland County, imp.*, 56 Wis. 345, 347, 14 N.W. 297, 298 (1882), the court said:

> "Without going into any discussion as to the etymology of the language employed [in Sec. 3, ch. 309, Laws of 1880] or whether the error or defect must go, not only to the validity of the assessment, but also to the groundwork of the tax, we are clearly of the opinion that the word 'assessment,' *as here used*, goes to the whole statutory method of imposing taxes on property." (Emphasis supplied).

Finally, at the opposite end of the spectrum, extreme examples of adulteration of the term "assessment" are to be found in private agreements of individuals which have employed the term indiscriminately. The variety of concepts ascribed to the term is aptly illustrated by many of the cases collated in Annot., 48 A.L.R.3d 287

(1973), "Landlord and Tenant: Construction of Provisions of Lease Providing for Escalation of Rental in Event of Tax Increases." Although none of the decisions cited therein is in point, the variety of usage employed illustrates the practical flexibility of the term. *See, e.g., Auerbach v. Mr. & Mrs. Foster's Place, Inc,* 128 Misc. 875, 220 N.Y.S. 281 (1927); *Heymann v. Nuss,* 97 Pa.Super. 114 (1929); *Bernstein v. Bernstein,* 205 App.Div. 741, 200 N.Y.S. 1 (1923).

The foregoing, we believe, clearly supports the trial court's view that the phrase in question required construction because it was patently ambiguous. The appellant's first assignment of error is without merit.

Neither are we troubled by the trial court's endeavor to ascertain the intended meaning of the ambiguous phrase from a perusal of the whole agreement. The language of a lease agreement, as any other contract must be considered as an integrated whole, giving effect, if possible, to all parts of the instrument. *See, Wood Coal Company, Inc. v. Little Beaver Mining Corp.,* 145 W. Va. 653, 116 S.E.2d 394 (1960); *Clayton v. Nicely,* 116 W. Va. 460, 182 S.E. 569 (1935); *Watson v. Buckhannon River Coal Co.,* 95 W. Va. 164, 120 S.E. 390 (1923). The second assignment of error is likewise without merit.

Having thus confirmed the trial court's judgment that the lease provision in question required construction and, as well, that such construction was properly made in view of the entire agreement, we look to the propriety of that court's substantive decision. At this juncture, we note that it is not the purpose of this review to preempt the *nisi prius* function of the trial court by our independent construction of the agreement; it is, rather, to sustain such construction in the absence of some showing that the construction was erroneous. *See,* 5 C.J.S., *Appeal & Error* § 1566 (1958); *Williams v. Ray,* 107 Fla. 327, 144 So. 679 (1932); *Helie v. Wickersham,* 103 Fla. 254, 137 So. 226 (1931).

In the consideration of this lease agreement, as with any other contract, the overriding endeavor must be to

ascertain and give effect, if possible, to the mutual intent of the parties. *See, Curtis v. Meadows,* 84 W. Va. 94, 99 S.E. 286 (1919); *Wetterwald v. Woodall,* 83 W. Va. 647, 98 S.E. 890 (1919); *Garrett v. Patton,* 81 W. Va. 771, 95 S.E. 437 (1918); *Taylor v. Buffalo Colleries Co.,* 72 W. Va. 353, 79 S.E. 27 (1913); *South Penn Oil Co. v. Knox,* 68 W. Va. 362, 69 S.E. 1020 (1910); *John v. Elkins,* 63 W. Va. 158, 59 S.E. 961 (1907). This cardinal principle, of course, elicits no dispute in this case, but the parties seemingly part on whether the lessor or lessee should be favored by the law in the resolution of doubtful provisions of a lease. This question arises upon the fact that the lessee Company was the author of the lease in issue.

Traditionally or, at least, historically, it has been widely recognized that the lessor normally assumed the responsibility of preparing the lease agreement. A rule of construction developed upon this recognition, that ambiguity in a lease was to be resolved in favor of the lessee and against the lessor. In *Lawson v. West Virginia Newspaper Publishing Co.,* 126 W. Va. 470, 29 S.E.2d 3 (1944), it was said:

> "This position is further justified by the well-recognized requirement that, *ordinarily,* in construing a lease, doubtful questions should be resolved in favor of the lessee. *Hacquard v. Sweetwine,* 92 W. Va. 681, 115 S.E. 797." (Emphasis supplied). *Id.* at 475.

In *Carbon Fuel Company v. Gregory,* 131 W. Va. 494, 48 S.E.2d 338 (1948), this Court quoted with approval the following statement from *Oakwood Smokeless Coal Corporation v. Meadows,* 184 Va. 168, 34 S.E.2d 392 (1945):

> " 'Where a doubt exists as to the meaning of lease restrictions as to the use of property, such provisions are to be resolved in favor of lessee and against lessor.' " At 499, *Carbon Fuel Company v. Gregory, supra.*

Fortunately, in applying the foregoing rule, Judge Fox also exposed its underlying rationale:

> "Under settled law, the lease should be construed most strongly against the lessor, who, *it*

> *is assumed, prepared the same,* and who had it in its power to incorporate therein restrictions on the use of the leased premises and failed to do so." (Emphasis supplied). *Id.* at 498.

Thus, closer scrutiny of the "ordinary" rule of construction of leases reveals the application of the more fundamental principle that doubtful provisions of a written instrument should be construed most strongly against the party preparing it. *See, Henson v. Lamb,* 120 W. Va. 552, 199 S.E. 459 (1938); *Charlton v. Chevrolet Motor Co.,* 115 W. Va. 25, 174 S.E. 570 (1934); *Peerless Carbon Black Co. v. Gillespie,* 87 W. Va. 441, 105 S.E. 517 (1920). Accordingly, where, as here, ambiguity arises upon the written language chosen by the lessee in drafting the lease agreement, the "ordinary" rule of construction stated in *Hacquard, supra,* and *Lawson, supra,* yields to the root principle that doubt is to be resolved most strongly against the party who prepared the instrument—in this case, the lessee.

We believe it is also important to note further the rule of general application that, in the construction of contracts, words or clauses are not to be treated as meaningless or discarded if any reasonable meaning consistent with the other parts of the contract can be given them. As was said in *Wood Coal Company, Inc. v. Little Beaver Mining Corp.,* 145 W. Va. 653, 116 S.E.2d 394 (1960):

> " 'A contract must be considered as a whole, effect being given, if possible, to all parts of the instrument.' Syllabus, *Clayton v. Nicely,* 116 W. Va. 460." *Syllabus, id.*

This rule, it seems, gives special credence to the trial court's decision which construed the term "assessment" so as to give it meaning compatible with its modifiers within the subject phrase and, as well, within the whole agreement. If, as noted, the word "assessment" had been given its narrow technical signification under the West Virginia statutory scheme, it would have referred to the particular day on which liability for taxes was

fixed and property value was determined (*George F. Hazelwood Company v. Pitsenbarger, Assessor, supra.*) and would have rendered the modifiers—"full first year's— totally incompatible. In order to give the phrase understandable meaning and, at the same time, give effect to every word within the phrase compatible with the entire agreement, the word "assessment" was properly construed as having been intended in its more expansive sense, as synonymous with taxation in general. See, Black's Law Dictionary, *supra*. Upon all of the foregoing, we believe, the trial court was justified in construing "full first year's assessment" to mean full first year's tax obligation, thus establishing a base year, before the property was revalued to reflect the lease improvements, for future allocation of tax liability between lessor and lessee.

For the foregoing reasons, the circuit court's ruling on this issue cannot be said to have been clearly wrong in its factual findings nor to have been erroneous in its legal conclusions. The court's judgment, therefore, is affirmed on the first issue.

The remaining issue of this case was raised by appellee's cross-assignment of error to the ruling of the trial court denying recovery of reasonable expense and attorneys' fees. In the lease contract, the parties mutually agreed the successful party in an action to enforce the lease or to recover for a breach of the lease should recover from the unsuccessful party, in addition to other appropriate relief, "the reasonable expense and attorneys' fees" as a part of the judgment.

The trial court refused to enforce this provision of the lease contract in favor of Moore, the prevailing party below. In ruling on this point, the court held:

> ". . . I do not believe that a party may, in this State, recover attorney's fees in such a case as this, notwithstanding the agreement. The rationale of the rule stated in *Raleigh County Bank v. Poteet*, 74 W. Va. 511, [82 S.E. 332 (1914)] is, in my opinion, applicable in the instant case."

The *Poteet* decision invalidated a provision in a negotiable instrument requiring the maker to pay attorney fees in the event that court action was necessary for collection of the proceeds of the note. As respects negotiable instruments, that holding has been followed in the subsequent cases of *First National Bank of Mannington v. Bank of Mannington*, 76 W. Va. 356, 85 S.E. 541 (1915); *First National Bank of Pineville v. Sanders*, 77 W. Va. 716, 88 S.E. 187 (1916); and *Campen Bros. v. Stewart*, 106 W. Va. 247, 145 S.E. 381 (1928) and recognized in the recent case of *Gavenda Bros., Inc. v. Elkins Limestone Co., Inc.*, 145 W. Va. 732, 116 S.E.2d 910 (1960).

In the *Poteet* case, the Court grounded its decision on several bases: (1) lack of consideration, (2) usury, (3) oppression, (4) statutory preemption, and (5) the encouragement of litigation. While the concepts of lack of consideration and usury were, and are, defenses to be considered as respects negotiability of notes and money lending under both the Negotiable Instruments Law and the successor Uniform Commercial Code, such considerations are not relevant in determining the enforceability of covenants in a mutually-agreed-to and freely-bargained-for lease. The legal concept of "oppression" as it was discussed in the *Poteet* case, also has no relevancy to determinations involving the enforceability of mutual covenants in a commercial lease agreement.

Further, we do not believe the fifth consideration relied upon by the *Poteet* Court to be pertinent to the enforceability of a mutual covenant contained in a commercial lease agreement. Of course, the law never encourages litigation, but when a man suffers injury to his person or his property, the courts of this State are open for the purpose of peaceful redress of grievances. *See, W. Va. Const.*, Art. III, § 17. In the context of complex business dealings resulting in the execution of lease agreements, it is to be anticipated, despite the best efforts of the parties, that occasional disputes may require resolution by the courts. When these disputes are submitted for judicial determinations, in our view, it is far better that courts and judges receive the benefit of

of the expressed intentions of the parties ascertainable from the plain provisions of the contract. It would seem that public and juridical policy is served when the parties agree to liquidated damages for reasonable expenses and attorneys' fees in the event of court action required to resolve disputes between parties to a commercial lease agreement.

The most troublesome aspect of the *Poteet* decison was its direct holding that the Legislature, with the adoption of the predecessor of *W. Va. Code*, 59-2-14, as amended, provided for the award of statutory attorney fees in the amount of $10.00 per case litigation and by such prescription dealt "fully and comprehensively with the subject and presumptively made what was deemed an adequate provision...." *Id.* at 514 of the West Virginia Report. By this holding, the majority, speaking through Judge Poffenbarger, ruled that West Virginia courts could not enforce a contractual stipulation or agreement for attorney fees as a part of the judgment for damages or costs, in excess of that allowed by statute. The validity of that holding in the context of usury, *vis-a-vis* the collection of proceeds of promissory notes and commercial paper pursuant to the Negotiable Instruments Law or its successor codification, the Uniform Commercial Code, is not questioned in this appeal.

On the other hand, we cannot believe that it was the intention of the Legislature, in authorizing recovery of a statutory attorney fee, to prohibit the aid of the courts in the enforcement of fair and reasonable contract provisions arrived at by mutual and intelligent bargaining between parties who are adequately informed, and thus well protected, in their legal rights. In fact, there is authority to the contrary in this jurisdiction. An early case, *Castle v. Castle*, 69 W. Va. 400, 71 S.E. 385 (1911), explicitly recognizes that private persons, by contract, may make special provisions between themselves with regard to court costs and that equity courts would enforce such provisions:

> "Generally speaking, the control over costs in equity suits is a matter largely within the discre-

tion of the chancellor. Sec. 10, ch. 138, Code 1906; *Nutter v. Brown*, 58 W. Va. 237. But in the present case the costs had been made the subject of an agreement between the parties, which took it out of the court's discretion. Both of the compromise agreements expressly stipulated that each of the parties should pay his own costs in the first suit. The decree holds that these contracts are binding; and we do not see how the court could have then disregarded the stipulation as to costs, which appears to be as binding as any other portions of the agreements...." *Id.* at 402-403.

We observe, also, that many other jurisdictions in this Country expressly approve recovery for stipulated attorney fees and expenses of litigation, either in predetermined sums or as established by judgment order, on the basis of reasonableness. *See*, Annot., 77 A.L.R.2d 735 (1961) and cases cited therein. *See also*, 17 Am. Jur. 2d *Contracts* § 164 (1964).

We are compelled to recognize the thrust of appellee's contention that public policy, perceived and declared in the early part of this century or in the latter part of the nineteenth century, has the functional value of a cigar store indian in the context of today's sophisticated business bargaining. Rightly or wrongly, the expense of legal services to contemporary litigants is of a magnitude beyond the remotest speculation of the eminent jurists of another time. Contracting parties negotiate and conclude their agreements with full realization of the substantial expense, legal and otherwise, which may be attendant upon controversies as may occur between them. As here, such realization may well be reflected in the covenants of the contract. If one of the provisions of a commercial lease agreement provides for the allocation of reasonable attorneys' fees concomitant with the judicial resolution of a contract dispute, why should a court of law interpose its judgment and prohibit agreement of the parties on this subject? What public policy requires a judicial fiat that competent parties to a commercial lease agreement shall be forbidden to anticipate and

solve the problem of litigation expenses in a manner which they, themselves, deed proper? None.

A mutual covenant contained in a commercial lease agreement, providing for the recovery of reasonable attorneys' fees and expense of litigation, available to either party who successfully recovers for breach of the lease contract or enforces its provisions, is valid and enforceable in the courts of this State.

The contrary ruling of the trial court is reversed and this case must be remanded for a judicial determination of reasonable attorneys' fees and reasonable expenses of litigation, if any, recoverable by the appellee Moore.

For the foregoing reasons the decision of the Circuit Court of Kanawha County is affirmed in part, reversed in part, and the case is remanded with directions for disposition in accordance with the principles expressed in this opinion.

*Affirmed in part;*
*reversed in part;*
*and remanded with*
*directions.*