*410 A.2d 1332.*

EDWARD L. MAGGIACOMO *et ux. vs.*
ARMANDO DiVINCENZO,
TAX ASSESSOR OF THE CITY OF CRANSTON.

JANUARY 23, 1980.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   Armando DiVincenzo is the tax assessor for the city of Cranston. He is before us on a consolidated appeal that revolves around certain actions taken by him as assessor during the years 1977 and 1978. His conduct during 1977 was challenged by a class action commenced by the plaintiffs, Edward and Ingeborg Maggiacomo, on their own behalf and that of all taxpayers similarly situated. When DiVincenzo repeated in 1978 what he had done in 1977, the plaintiffs instituted a second class action. However, they abandoned the class-action aspects of this particular suit and ultimately sought relief solely for themselves. Subsequently, the plaintiffs' motion for a summary judgment in each suit was granted. Hereinafter, we shall refer to the plaintiffs as "the taxpayers" and the defendant, DiVincenzo, as "the assessor."

The factual background giving rise to this controversy is undisputed. On May 16, 1977, the Cranston City Council, acting pursuant to the powers granted it by G.L. 1956 (1970 Reenactment) §44-5-1 and sec. 6.11 of the Cranston City Charter, adopted a resolution that levied a tax on all ratable real estate and tangible personal property located within the city. This resolution authorized the assessor to set a tax rate that could generate revenues of not less than $24,775,928.48 and not more than $25,000,000. Once the resolution passed, the assessor set a tax rate of $67 per $1,000 of assessed valuation. The potential tax revenue that might be realized by this rate would have exceeded the council's $25,000,000 maximum by $915,417.06.

A year later history repeated itself. The city council by its resolution of May 15, 1978, directed the assessor to fix a tax rate that could generate revenue of at least $28,798,173.95 but no more than $28,850,000. Ever vigilant in his duties and true to his custom, the assessor fixed a rate that might have generated approximately $1,250,000 more than the $28,850,000 maximum established by the council.

In Superior Court the assessor conceded that, in setting the tax rate, he had factored into his calculations a "collection ratio" that made allowance for anticipated uncollectible taxes. He further revealed that without a cushion for the uncollectibles, the 1977 rate would have been $64.59 instead of $67 per $1,000 of assessed valuation. The 1978 tax rate was set at $76.95 per $1,000 of assessed valuation, whereas if the assessor had deleted the "collection ratio" factor, the rate would have been reduced by $3.25. The assessor admitted that ever since assuming office, he had set a tax rate that contained an allowance for the uncollectible taxes. He justified this practice by arguing that even though he lacked the power to levy a tax, he had the duty to set a rate high enough to guarantee that the tax collector would receive an amount at least equal to the minimum sum authorized by each levy.

The taxpayers, on the other hand, claim that when the assessor set a rate which could yield a return in excess of the maximum specified in the levy, he was usurping the power of the council, specifically, its power to levy a tax. The various justices of the Superior Court who considered the taxpayers' motions for summary judgment found this argument most persuasive. The assessor is now before us attempting to point out where the trial justices erred.

The taxpayers sought relief from the inclusion of the cushion for uncollectibles by filing a petition in compliance with the terms of G.L. 1956 (1970 Reenactment) §44-5-26, that in its pertinent part allows "[a]ny person aggrieved on any ground whatsoever by any assessment of taxes against him in any city or town * * *" to seek redress in the Superior Court. Before us the assessor, as he did in the Superior Court,

focuses his attention on that portion of §44-5-26 which speaks about "any assessment of taxes." According to the assessor, when the Legislature alluded to the "assessment of taxes," it was affording judicial relief only to those who were complaining about the valuation placed on their property by the assessor. The taxpayers, on the other hand, take the position that "assessment of taxes" encompasses within it the entire statutory method of imposing municipal taxes, including the assessor's duty to set a rate that will comply with the council's mandate.

At the outset, we acknowledge the earlier pronouncements of this court regarding statutory construction. Based upon these guidelines, our task is to glean the legislative intent from a consideration of this legislation in its entirety. *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 402, 368 A.2d 1194, 1199 (1977), *citing Mason* v. *Bowerman Bros., Inc.,* 95 R.I. 425, 431, 187 A.2d 772, 776 (1963). Furthermore, we are mindful of this court's mandate that "taxing statutes are to be strictly construed" with doubts resolved in favor of the taxpayer. *Van Alen* v. *Stein,* 119 R.I. 347, 359, 376 A.2d 1383, 1389 (1977); *Potowomut Golf Club, Inc.* v. *Norberg,* 114 R.I. 589, 592, 337 A.2d 226, 227 (1975).

Turning now to chapter 5 of title 44, we find that the words "assess" and "assessment" are used somewhat imprecisely.[1] In addition, there is general recognition that the term "assessment" may be used in a narrow sense to mean the value placed upon property for the purpose of taxation by an official appointed for that purpose, or in its broader sense to include within its context all those steps involved in the imposition of a tax on property. *Philadelphia, Baltimore and Washington R.R.* v. *Mayor and Council,* 30 Del. Ch. 213, 221, 57 A.2d 759, 764 (1948); *Commercial National Bank* v. *Board of County Commissioners,* 201 Kan. 280, 284-85, 440

---

[1]*See, e.g.,* G.L. 1956 (1970 Reenactment) §44-5-1 (assessment of valuations); §44-5-11 and §44-5-13 (assess valuations); §44-5-16 (assessment on real property); §44-5-22 (assessing the tax); §44-5-23, §44-5-24, and §44-5-26 (assessment of taxes).

P.2d 634, 637-38 (1968); *State ex rel. Halferty v. Kansas City Power & Light Co.*, 346 Mo. 1069, 1078, 145 S.W.2d 116, 120-21 (1940); *Moore v. Johnson Service Co.*, W. Va., 219 S.E.2d 315, 319-20, 322 (1975); *Prentice v. Ashland County*, 56 Wis. 345, 347, 14 N.W. 297, 298 (1882). Furthermore, we are still impressed by the relevance of Professor Cooley's sagacious observation: "Assessment proper includes valuation but valuation alone is not the assessment but instead only its most important element." 3 Cooley, *The Law of Taxation* §1044 at 2114 (4th ed. 1924).

Parenthetically, we would point out that the word "valuation" never appears in the pertinent portion of §44-5-26 and that the word "assessment" is used in juxtaposition to "taxes." Having in mind that the term "assessment" as used in our taxing statutes carries with it a variety of meanings and noting also the statutory language before us, to wit, "[a]ny person aggrieved on any ground whatsoever by any assessment of taxes * * *," we have no hesitancy in holding that within the context of §44-5-26 the term "assessment" refers to the entire plan or statutory scheme for the imposition and collection of taxes, including the calculation of the rate.

We turn next to the assessor's contention that his application of a collection ratio to the levy ordered by the city council neither violated any express or implied rule of law nor represented an arbitrary abuse of discretion. On the contrary, he contends with great vigor that his rate-setting activities were necessarily implied from sec. 6.11 of the Cranston City Charter.[2] We think otherwise.

---

[2]Cranston, R.I., City Charter, §6.11 (1962), provides in pertinent part that

"the council shall adopt and cause to be delivered to the city assessor a resolution levying and ordering the assessment and collection of a tax on ratable real estate and tangible personal property *at such a rate to be fixed by the city assessor* as provided by law *as will * * * amount in the aggregate to a minimum and maximum to be set forth in the resolution. The minimum shall be equal to the receipts from taxes on property as estimated in the operating budget as adopted and the maximum shall be as determined by the council.*" (Emphasis added.)

The obvious purpose of sec. 6.11 is to effectuate the collection of tax revenue needed to satisfy the financial demands that are delineated in the city's operating budget. The assessor is obligated to set a rate that will bring in the minimum but in no event exceed the maximum amount called for in the levy resolution. The assessor's concern for the uncollectibles is commendable, but Cranston's charter specifically provides for this concern. Section 6.02 requires the assessor to provide the director of finance with an estimate of the funds to be realized from taxation, "taking into account the probable rate of tax delinquency and other factors affecting tax collection" so that the director may prepare a preliminary estimate of the cost of municipal operations "in the ensuing fiscal year."[3] Section 6.03 requires the mayor, with the assistance of the director of finance and other city officials, to submit to the city council not later than April 1 of each year an operating budget that includes "an estimate of receipts for the ensuing fiscal year from taxes * * *." Section 6.09 authorizes the council to modify the proposed budget in any way it sees fit but then specifically provides: "If the action of the council results in raising the total of authorized expenditures above the total of estimated receipts the council must provide by ordinance an equivalent in increased receipts."

A review of Cranston's charter clearly shows that the assessor's concern for the uncollectibles is to be made known and accounted for before the budget is submitted to and approved by the council. It is the council, acting pursuant to sec. 6.11, and not the assessor, which has the authority to levy a tax and fix its amount.

While this court has never decided the exact parameters of the assessor's duty vis-a-vis the levy, numerous other jurisdictions have held that the tax assessor has no right to increase the amount levied. In Massachusetts, for instance, where

[3]Cranston operates on a fiscal year which begins on July 1 and ends on the following June 30.

assessors since 1785 have been permitted by statute[4] to add a 5 percent overlay to the amount voted, the Supreme Judicial Court held that "assessing more than five per cent, above the sums voted by the town to be raised, makes the assessment illegal and void * * *." *Libby* v. *Burnham*, 15 Mass. 144, 147 (1818). In *Cone* v. *Forest*, 126 Mass. 97, 97-98 (1879), the amount levied was $1,800.11. The 5 percent permitted by statute would have allowed an additional $90. Instead, assessors added $115.16, and the court held that the $25.16 in excess of the statutory limit was illegal.

In *State* v. *Bentley*, 23 N.J.L. 532 (1852), the assessor added to the amount authorized $998.71 for contingencies. The New Jersey Supreme Court explained that the assessor "did this in the exercise of what he considered a discretion vested in him by established custom" and because "these additional amounts were necessary to cover losses which were to be anticipated in collecting the taxes * * *." The court, however, found "[t]his proceeding on the part of the assessor was illegal" and stated unequivocally that "[t]he law vests in assessors no such authority. * * * Assessors and collectors are the mere instruments to execute the mandates which emanate from these [levying] bodies. The taxing power in every case may, and must, be relied on to provide for contingencies of this kind. The power assumed in this case by the assessor is of too arbitrary and dangerous a character to be countenanced for a moment ." *Id.* at 545. *E.g.*, *Huse* v. *Merriam*, 2 Me. 375 (1823); *Taft* v. *Barrett*, 58 N.H. 447 (1878); *State* v. *Flavell and Fredericks*, 24 N.J.L. 370 (1854); *St. Louis & S.F. R.R.* v. *Thompson*, 35 Okla. 138, 128 P. 685 (1912).

---

[4] Its contemporary counterpart is found in Mass. Gen. Laws Ann. ch. 59 §25 (West) (as amended by 1978 Mass. Acts, ch. 514, §79), entitled "Additional assessments," and provides in pertinent part:

> "The assessors in any city or town, except Boston, may add to the amount to be assessed not more than five per cent thereof, or such larger amount as the commissioner may approve, although the limit of taxation as fixed in any city may by such overlay be exceeded, such amount to be used only for avoiding fractional divisions of the amount to be assessed in the apportionment thereof * * *."

On the basis of the foregoing discussion, we find no persuasive authority either in our reading of the General Laws, the Cranston City Charter, or pertinent case law that would permit the assessor to add an amount to the levy for future uncollectible taxes. We conclude, therefore, that the assessor exceeded his authority when he set the tax rate at an amount, if fully collected, that would yield revenue above the maximum levy authorized by the city council.

A final but brief comment is directed to the assessor's argument that the Superior Court was barred from considering the taxpayers' motions for summary judgment because they failed to notify Rhode Island's tax administrator of the pendency of these suits. Concededly, §44-1-13 stipulates that whenever "the constitutionality or construction of any tax statute or the validity of the assessment of any tax is in question, the court before which such proceeding is pending shall not proceed * * *" until the administrator has been notified of the pendency of the controversy so that the "administrator may appear and be heard with reference thereto." We would point out that this statute, when it is looked at in conjunction with other portions of chapter 1 of title 44, is relevant only when the challenge being made concerns a tax that may be due the state. It has no applicability to the field of municipal taxation.

Accordingly, in each case the defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.

*Joseph T. Feeley,* for plaintiffs.

*Jeremiah S. Jeremiah, Jr.,* City Solicitor, *John D. Biafore,* Assistant City Solicitor, for defendant.