690 F.Supp. 1061 (1988)
STATE OF NEW JERSEY, et al.,
v.
CONSOLIDATED RAIL CORPORATION and United States of America.
Civ. A. No. 83-4.
Special Court, Regional Rail Reorganization Act.
July 21, 1988.
*1062 W. Cary Edwards, Atty. Gen. for the State of N.J., Deborah T. Poritz, Asst. Atty. Gen. (Joseph L. Yannotti, Deputy Atty. Gen. for the State of N.J., Trenton, N.J., of counsel), for plaintiff State of N.J.
M. Duncan Grant, Ellen Kittredge Scott, Pepper, Hamilton & Scheetz, John W. Rowe, Sr. Vice President, Law Consolidated Rail Corp., Philadelphia, Pa., for defendant Conrail.
Alan E. Kleinburd, U.S. Dept. of Justice, Commercial Litigation Branch Civ. Div., Washington, D.C., for defendant USA and Sec.
Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

MEMORANDUM OPINION AND ORDER
WEINER, Judge.
The above-captioned cause of action was instituted by the State of New Jersey, its Treasurer, Tax Director and Budget Director on March 1, 1983 against the Consolidated Rail Corporation ("Conrail") and the United States of America. The State is seeking monetary, declaratory and injunctive relief for unpaid taxes imposed against Conrail pursuant to the New Jersey Railroad Tax Act, N.J.S.A. 54:29A-1, et seq., for tax years 1981-1986 inclusive. Conrail has refused to pay the tax in reliance upon § 1140(a) of the Northeast Rail Service Act of 1981, 45 U.S.C. § 1101, et seq. (NERSA). NERSA amended the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701, et seq. (the Rail Act) to provide that Conrail would be exempt from any state tax except for taxes imposed by any political subdivision of a state. This Court has jurisdiction over the dispute pursuant to § 1152 of NERSA, 45 U.S.C. § 1105. Before the Court are cross-motions for summary judgment filed by New Jersey and Conrail and a motion to dismiss filed by the United States.
While the legal issues presented in this matter are complex, the undisputed facts are not. Several northeastern railroads became insolvent in the late 1960's and early 1970's. In response to a potential regional shutdown of rail transportation, Congress enacted the Rail Act to create an economically viable system of providing efficient regional rail service. Rail Act, § 101(b), 45 U.S.C. § 701(b). The Rail Act created Conrail as a private for-profit corporation, organized and existing under the laws of the Commonwealth of Pennsylvania. Conrail acquired the property of the insolvent railroads. The Rail Act was followed by Title I of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801, et seq., which amended the Rail Act to better attain the goals set forth therein, and by the Staggers Rail Act of 1980, Pub. L.No. 96-448, 94 Stat. 1895 (1980), which provided significant reforms in rate regulations.
*1063 The Staggers Rail Act also required the United States Department of Transportation and the United States Railway Association to submit reports to Congress concerning the future of Conrail. Although Conrail had received $3 billion dollars in federal subsidies it was, as of 1981, still not profitable. Congress' response was the passage of NERSA. NERSA's goals were to end the federal government's obligations to subsidize freight operations and return freight service to the private sector. NERSA, § 1133, 45 U.S.C. § 1102.
NERSA was enacted on August 13, 1981. Section 1140 of NERSA added § 217(c) to the Rail Act. Section 217(c), 45 U.S.C. § 727(c), is the center of this dispute. It provides:
The Corporation [Conrail] shall be exempt from liability for any State tax, except for any tax imposed by any political subdivision of a State, applicable to any taxable period commencing before January 1, 1987.
In reliance upon this provision Conrail has refused to pay certain New Jersey taxes from 1981 through 1986.
The New Jersey tax at issue is its Railroad Tax Law of 1948, N.J.S.A. 54:29A-1 et seq., as amended by P.L. 1966, c. 139 § 1, eff. June 17, 1966 (hereinafter the 1966 Amendment). The Railroad Tax generally provides for the imposition of a tax on property used for railroad purposes. N.J. S.A. 54:29A-7.[1] Facilities used for passenger service and the "main stem" of each railroad are exempted from the property tax. Importantly, N.J.S.A. 54:29a-11 provides that:
Taxes assessed pursuant to this act shall be in lieu of all other State or local taxation of or measured by property used for railroad purposes, including the main stem, tangible personal property and facilities used in passenger service, other than assessments for benefits.
In other words, no political subdivision of the State of New Jersey is permitted to impose a tax on the property of a railroad. The purpose of this tax structure was to provide a uniform rate, statewide, for the taxation of railroad property.
Prior to the 1966 Amendment, the New Jersey statute provided that the total tax receipts derived from the assessment of railroad property were to be allocated and paid over to the local taxing districts in which the property was situated.[2] N.J.S.A. 54:29A-24 (repealed). The 1966 Amendment struck out the prior percentage allocation, provided that the tax receipts would be applied to "the uses of the State according to law", N.J.S.A. 54:29A-23, and substituted a state aid program based upon each taxing district's own tax rate, using 1966 as a base year. N.J.S.A. 54:29A-24.1-24.6.
The manner in which the Railroad Tax is assessed and collected is also relevant to our discussion. The statute requires the Director of the Division of Taxation to classify all property used for railroad purposes as either main stem (Class I), facilities used in passenger service (Class III), or other real estate used for railroad purposes (Class II). The classifications must be made on or before November 1 of the year prior to the year for which the taxes will be assessed. The Director's classifications and his valuation of Class II real estate used for railroad purposes are to be provided to the taxpayer on or before November 10. N.J.S.A. 54:29A-17. The Director is to provide the taxpayer with an assessment of the Class II property used for railroad purposes by December 15 of each year which establishes taxes for the following year. N.J.S.A. 54:29A-18.1. The tax is to be paid on or before December 1st in the year for which it is assessed. N.J.S.A. 54:29A-46. However, the taxes imposed by the Act become a lien on the taxpayer's property as of the first day of the year in which the tax is payable. N.J.S.A. 54:29A-54. In other *1064 words, while the tax is not statutorily due and owing until December 1, a statutory lien arises to secure its payment as of January 1.
On or about November 10, 1980, the Director of the Division of Taxation provided Conrail with a detailed statement of the classification of its railroad properties in the State of New Jersey. On or about December 10, 1980, the Director provided Conrail with its railroad property tax assessment for the 1981 tax year. The assessment indicated that $2,993,840.72 was due to be paid on or before December 1, 1981. A lien in this amount arose by operation of law on January 1, 1981. The certification provided to Conrail indicated that the total of all of the State's railroad tax assessments was $3,063,946.85. See Affidavit of Ivan Haftkowycz, at ¶ 12. (Haftkowycz Affidavit).
On or about December 12, 1980, the Director of the Division of Taxation provided the Director of the Division of Budget and Accounting with a certification of the State aid to be paid to the municipalities in which property used for railroad purposes was located. The certification indicated that some 83 New Jersey municipalities would be entitled to State aid according to the terms of the New Jersey Railroad Tax Act. The total amount of the State aid for 1981 was calculated to be $3,892,056.68. That amount was appropriated by the Legislature in its appropriations act for the fiscal year commencing July 1, 1981. (Haftkowycz Affidavit at ¶ 4).
NERSA came into effect on August 13, 1981. Sometime thereafter, Conrail notified the State of New Jersey of its position that NERSA exempted it from the Railroad Tax due on December 1, 1981. Conrail has not paid New Jersey Railroad Taxes for tax years 1981 through 1986. State aid budgeted for 1981 was paid to eligible municipalities. No state aid has been budgeted or paid subsequent to 1981.
In its motion for summary judgment, the State argues that: (1) even though the Railroad Tax is collected by the State pursuant to a state statute, since the tax is in lieu of local property taxes and the revenue collected is paid to local taxing districts wherein railroad property is located, the exemption of § 217(c) is not applicable; (2) Conrail is not constitutionally immune from state taxation and Congress was without the power to exempt it from the taxation of a sovereign state; (3) § 217(c) could not operate to exempt Conrail for tax year 1981 since the State's statutory lien arose before NERSA's effective date; and (4) if NERSA's enactment is held to apply to tax year 1981, a taking has occurred without just compensation in violation of the Fifth Amendment. Conrail's motion for summary judgment argues that: (1) the New Jersey Railroad Tax is clearly a "state tax" as that phrase is used in § 217(c); and (2) as for 1981, since the tax was not statutorily due until after NERSA's effective date, it is exempt for tax year 1981 as well as subsequent years. In its motion for dismissal, the United States takes no position on the question of Conrail's 1981 tax liability. It does argue that Congress was within its power under the Commerce Clause to exempt Conrail from state taxation. The United States further argues that even if we find Conrail liable for 1981 Railroad Tax and find that NERSA extinguished that liability, there has been no taking since states have no right to tax instrumentalities of interstate commerce when such taxation conflicts with federal law.

DISCUSSION

A. Is New Jersey's Railroad Tax A "State Tax" Within The Meaning of § 217(c)?

It is clear to the Court that the Railroad Tax falls within the literal terms of § 217(c). The section extends its exemption to "any State tax." The Railroad Tax is imposed by a statute enacted by the New Jersey Legislature. It is collected and enforced by the executive branch of the state government. The State seeks to avoid the obvious result by arguing that since its tax is expressly in lieu of local property taxes and all the revenues generated by the tax are returned to its political subdivisions, Congress never intended that Conrail be exempted from the tax. We cannot agree.
*1065 Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear. Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Because we find § 217(c) to be unambiguous, recourse to its legislative history will be unnecessary. When a federal statute unambiguously forbids the States to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look beyond the plain language of the federal statute to determine whether a state statute that imposes such a tax is preempted. Aloha Airlines, Inc. v. Director of Taxation, 464 U.S. 7, 12, 104 S.Ct. 291, 294, 78 L.Ed.2d 10 (1983). The statute clearly identifies Congress' intent to shield Conrail from "liability for any State tax." Congress' use of the word "any" must be given its ordinary meaning. The shield is to be unqualified and absolute. The words "state tax", also assigned their ordinary meaning, indicate the shield extends to any levy enacted by a state legislature. The second part of § 217(c), permitting taxes to be imposed by political subdivisions of a state, may not, as New Jersey contends, be read to permit state taxes in lieu of local taxes. Again, the words are unambiguous and must be given their ordinary meaning. The intent of Congress was to permit counties and municipalities to tax Conrail. We find that the tax at issue here is clearly a state tax. The scheme of taxation set up by the New Jersey Railroad Tax is a mirror-image opposite of that permitted by Congress. By no stretch of reason could the New Jersey tax fall within the structure intended by Congress.

B. Does Congress Have The Power To Exempt A Private, For-Profit Corporation From State Taxation?

This case requires us to apply that line of cases in which the United States Supreme Court has discussed the relationship between the powers of Congress under the Commerce Clause and those rights reserved to the states under the Tenth Amendment. The State of New Jersey argues that, in enacting § 217(c), Congress has impinged upon its rights as a sovereign to tax a private entity doing business within its borders. It argues that NERSA was passed, not as an effort to lessen a burden on interstate commerce, but to lessen the financial burden to the federal government to subsidize Conrail by forcing the states to forego their tax revenues as an indirect subsidy. The State contends that its tax is non-discriminatory and non-burdensome, there being no rational basis for concluding that taxes imposed upon Conrail by state governments burden interstate commerce while taxes imposed by the political subdivisions of a state do not.
In National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court determined in a 5-4 majority opinion that the Tenth Amendment imposed a substantive restraint upon Congress' power under the Commerce Clause to legislate upon the states "in areas of traditional governmental functions." Id. at 852, 96 S.Ct. at 2474. The case involved Congress' attempt to extend the requirements of The Fair Labor Standards Act to state government employees. However, eight years later in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court, also by a 5-4 decision, reversed itself holding that the "traditional governmental functions" test was "unsound in principle and unworkable in practice." Id. at 546-547, 105 S.Ct. at 1015-1016. Instead, the Court determined that the fundamental limitation that "the constitutional scheme imposes on the Commerce Clause to protect the `States as States' is one of process rather than one of result." Id. at 554, 105 S.Ct. at 1019. Any substantive restraint in the exercise of Commerce Clause powers must, the Court held, find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process, rather than to dictate a sacred province of state autonomy. Ibid., quoting EEOC v. Wyoming, *1066 460 U.S. 226, 236, 103 S.Ct. 1054, 1060, 75 L.Ed.2d 18 (1983).
Under the test laid down in Garcia we are constrained to find § 217(c) a valid exercise by Congress of its Commerce Clause powers unless we find some breakdown in the national political process which prevented New Jersey from protecting its interests. No such defect has been alleged or argued. In Garcia, the Court has abandoned the attempt to attach any substance to the Tenth Amendment's "truism that all is retained which has not been surrendered."[3]U.S. v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). Therefore, as the power of Congress over interstate commerce is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution, Id. at 114, 61 S.Ct. at 457 citing Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 196, 6 L.Ed. 23 (1824), and Garcia has removed the Tenth Amendment as a substantive limitation within the Constitution to Congress' power to legislate upon the States as States, we find § 217(c)'s exemption of Conrail from New Jersey's Railroad Tax to be a valid exercise of the Commerce Clause. Accord, National R.R. Passenger Corp. v. New Castle County, 633 F.Supp. 354 (D.Del.1986) (parallel provision exempting Amtrak from state and local taxation held to be valid exercise of Congress' power under the Commerce Clause and Necessary and Proper Clause); Dept. of Revenue and Taxation v. National R.R. Passenger Corp., No. C82-0320-B (D.Wyo. Dec. 15, 1982) (slip op) [available on WESTLAW, 1982 WL 1584].

C. Does § 217(c) Exempt Conrail For Tax Year 1981?

New Jersey argues, as a matter of statutory construction, that Conrail is liable for 1981 Railroad taxes because its liability arose before the effective date of NERSA. The State relies upon (1) its statutory lien which, as detailed above, arises as of the first day of the tax year, even though the tax is not "due and delinquent" until December 1 of the tax year, see N.J.S.A. 54:29A-46, and (2) its prior assessment, in arguing that Conrail's liability predated § 217(c)'s enactment. Conrail, focusing upon the tax's due date argues that NERSA, effective as of August 13, 1981, cut off its liability for a tax to be paid on December 1, 1981. As we find that the word "assessment," as it is used in N.J.S.A. 54:29A-18.1, is synonymous with imposition of liability, we conclude that the exemption of § 217(c) is not applicable to tax year 1981.
While 217(c) speaks in terms of liabilities, the Railroad Tax speaks in terms of assessments. It is undisputed by the parties that New Jersey's assessment against Conrail for its 1981 tax, made before the passage of § 217(c), was valid. Assessment, however, can have two possible, albeit interrelated, meanings. To assess can be defined as to determine the rate of or amount of. It may also be defined as to determine and impose the amount of a tax. Websters New International Dictionary (Unabridged) (3d Ed.1961). See also Bull v. United States, 295 U.S. 247, 259-260, 55 S.Ct. 695, 699-700, 79 L.Ed. 1421 (1935) (An assessment in an administrative determination that a certain amount is currently due and owing as a tax. It makes the taxpayer a debtor in such the way as would a judgment.); Moore v. Johnson Service Co., 158 W.Va. 808, 219 S.E.2d 315 (1975) (The word "assess" has a broad or narrow meaning according to the sense or connection in which it is used. In its broadest sense the term includes the entire process of listing valuing and levying.); Holt v. May, 235 N.C. 46, 68 S.E.2d 775 (1952) (the word "assess" is synonymous with "levy".); People v. Priest, 169 N.Y. 432, 62 N.E. 567 (1902) (the word "assess" is used as meaning to impose a tax.) See also 84 C.J.S. Taxation § 391 (1954). We believe that as used in N.J.S.A. 54:29A-18.1 the latter definition applies. The section provides, in pertinent part:

*1067 ... not later than December 15 in each year the commissioner shall deliver to the taxpayer a detailed statement of the taxpayer's Class II property together with the assessment of such property for the following tax year at the rate hereinabove established.
The state's delivery to Conrail of its assessment for the following tax year at the rate established was the formal levy of its 1981 tax. The assessment fixed Conrail's liability which was secured by the state's statutory lien arising on January 1.
As Conrail's liability was fixed and secured prior to 217(c)'s enactment, unless we can find an unequivocal and manifest intention on the part of Congress that 217(c) was to have retroactive effect, it will not excuse Conrail from payment of 1981 Railroad Tax. The Supreme Court has often noted, most recently in United States v. Security Industrial Bank, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982):
[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past.... The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." Union Pacific R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199 [34 S.Ct. 101, 102, 58 L.Ed. 179] (1913) (citations omitted)
We find nothing in the language of § 217(c) to suggest that Congress intended to relieve Conrail from the payment of taxes assessed prior to August 13, 1981. We, therefore, hold that Conrail is not exempt from liability to the State of New Jersey for 1981 Railroad Tax in the amount of $2,885,498.69 plus interest.
Having so found it will be unnecessary to consider at length New Jersey's claim against the United States that the enactment of NERSA effected a taking of property in violation of the Fifth Amendment. As we have determined that § 217(c) does not apply to 1981, no taking has occurred. The claims against the United States will, therefore, be dismissed.

CONCLUSION
In conclusion, we find that New Jersey's Railroad Tax is a state tax as that phrase is used in § 217(c). We find that § 217(c) is a valid exercise by Congress of its power to regulate commerce among the several states. However, we find that § 217(c) does not operate to exempt Conrail from Railroad Tax liability for tax year 1981. For these reasons, the motion for summary judgment of New Jersey will be granted in part and denied in part. The motion of the United States for dismissal will be granted.
NOTES
[1] The statute also imposes a franchise tax based upon railroad revenues. N.J.S.A. 54:29A-13. This latter provision is not, however, at issue here.
[2] The old allocation formula simply set up a ratio between the amount of railroad property in a particular taxing district and the total railroad property assessable in the state. The local taxing district received this percentage of Railroad Tax revenues.
[3] The Tenth Amendment states in its entirety:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.