**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and Township of Lower Merion.**

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and Township of Upper Gwynedd.**

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION.**

Civ. Nos. 92–0112, 92–1029 and 92–3793.

United States District Court, E.D. Pennsylvania.

June 29, 1993.

David P. Bruton, Alfred W. Putnam, Jr., Drinker, Biddle & Reath, Philadelphia, PA, for Southeastern Pennsylvania Transp. Authority.

Gilbert P. High, Jr., Thomas D. Rees, Lori K. Comer, High, Swartz, Roberts & Seidel, Norristown, PA, for Lower Merion.

David A. Salapa, Lemoyne, PA, Susan D. Colwell, Harrisburg, PA, for Pennsylvania Public Utility Com'n.

Robert J. Kerns, Carol A. Sweeney, Landis, Kerns & Associates, Lansdale, PA, for Upper Gwynedd.

## OPINION

LOUIS H. POLLAK, District Judge.

Before me in these consolidated cases are cross-motions for summary judgment filed, on the one hand, by plaintiff Southeastern Pennsylvania Transportation Authority

("SEPTA"), and, on the other hand, by defendant Pennsylvania Public Utility Commission ("the PUC"), defendant Township of Lower Merion ("Lower Merion"), and defendant Township of ·Upper Gwynedd ("Upper Gwynedd"). For the reasons that follow, summary judgment will be granted in favor of SEPTA and the PUC will be permanently enjoined from assessing against SEPTA any costs for construction, design, maintenance, inspection or repair of the four subject highway bridges.

## I.

### Factual and Procedural Background

The background of these consolidated cases has been set out in some detail in a previous opinion denying defendants' motions to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. *See Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 802 F.Supp. 1273 (E.D.Pa.1992). Therefore, I only briefly rehearse those facts here and encourage the interested reader to consult my prior opinion.

In 1991 and 1992, the PUC issued three separate orders requiring that SEPTA make payments toward the upkeep of four highway-bridge structures passing over railway lines owned and operated by SEPTA.[1] In each case, the PUC determined that SEPTA, as the operator of the railway line running under the bridge, benefitted from a separated railway-highway crossing and should therefore share bridge-maintenance costs with the localities that owned the roads and also benefitted from a separated crossing.[2] SEPTA argued unsuccessfully to the PUC that this assignment of costs to SEPTA violated a pair of federally-conferred tax exemptions: 45 U.S.C. § 581(c)(5) (1988) and 45 U.S.C. § 546b (1988).

The history of these tax-exemption statutes is fairly straightforward. In 1981, Congress required that the financially-troubled Consolidated Rail Corporation ("Conrail")— established by federal law to provide national rail transportation—transfer its commuter rail operations to local commuter authorities. To assist these local authorities with handling the provision of commuter service, Congress created the Amtrak Commuter Services Corporation ("Amtrak Commuter"), as a wholly-owned subsidiary of the National Railroad Passenger Corporation ("Amtrak"), and afforded the local authorities a choice between contracting with Amtrak Commuter for provision of commuter rail service formerly handled by Conrail or operating commuter rail service directly. SEPTA decided to operate its own local commuter rail service and, on January 1, 1983, assumed from Conrail the operation of thirteen commuter rail lines.

On September 10, 1982, Congress enacted 45 U.S.C. § 546b, exempting Amtrak— which, like Conrail, was struggling financially—and its newly-created subsidiary Amtrak Commuter "from any taxes or other fees imposed by any State, political subdivision of a State, or a local taxation authority which are levied ... from and after October 1, 1981...." 96 Stat. 852 (1982), codified at 45 U.S.C. § 546b. In exempting Amtrak from state taxation, Congress reasoned that local jurisdictions benefitting from Amtrak's rail service have an obligation to contribute to its continued existence through tax relief. Then, in 1988, Congress enacted 45 U.S.C. § 581(c)(5), providing that:

> Notwithstanding any other provision of law, any commuter authority that could have contracted with Amtrak Commuter for the provision of commuter service but which elected to operate directly its own commuter service as of January 1, 1983, shall be exempt from the payment of any taxes or other fees to the same extent as [Amtrak] is exempt.

45 U.S.C. 581(c)(5) (1988).

---

1. The four bridges are: the Montgomery Avenue bridge in defendant Lower Merion, Swedesford Road bridge located in defendant Upper Gwynedd, and the Johnson Street and Willow Grove Avenue bridges in the City of Philadelphia (not a defendant in the case at bar).

2. With respect to three of the four bridges, the PUC found that SEPTA owned the bridge and cited this as an additional reason for requiring SEPTA to contribute to bridge maintenance.

Relying on two Pennsylvania Commonwealth Court opinions,[3] the PUC determined, in three separate orders, that § 581(c)(5) did not exempt SEPTA from assessments for bridge maintenance because such assessments were not "taxes or other fees" within the meaning of the federal exemption. Subsequently, SEPTA appealed each PUC decision to the Pennsylvania Commonwealth Court, and then apparently applied for, and was granted, a stay of each state proceeding after filing each of three separate complaints with this court. In these federal complaints, consolidated on August 19, 1992, SEPTA argues that the imposition upon SEPTA of bridge-maintenance costs violates the federal tax-exemption statutes; SEPTA seeks a declaration to that effect and a permanent injunction against assessment of such costs by the PUC with respect to the four bridges. In its complaints, and again in its motions for summary judgment, SEPTA relies heavily on *National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 848 F.2d 436 (3d Cir.1988) *(Amtrak I ), cert. denied,* 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988), in which the Third Circuit held that the immunity afforded Amtrak in § 546b precluded the PUC from assessing Amtrak for costs incurred in the reconstruction and future maintenance of a bridge overhanging Amtrak-owned railway tracks. On SEPTA's view, because the PUC cannot assign bridge-maintenance costs to Amtrak without running afoul of § 546b, and because, pursuant to § 581(c)(5), SEPTA, as a local commuter authority, is entitled to relief from "taxes or other fees to the same extent as" Amtrak, it follows that SEPTA cannot be required by the PUC to contribute to improvements on a highway bridge passing over its railway lines.

In a September 29, 1992 opinion, I rejected defendants' arguments that the Tax Injunction Act, 28 U.S.C. § 1341 (1988), or the Eleventh Amendment deprived this court of subject-matter jurisdiction over these consol-

idated cases, or that SEPTA had failed to state a legally sufficient claim. In doing so, and specifically in response to an argument that no "taxes or other fees" had been imposed upon SEPTA within the meaning of § 581(c)(5), I decided that, under *Amtrak I,* the costs in question in these consolidated cases are, as a matter of law, "taxes" under § 581(c)(5). Buoyed by this portion of my September 29 opinion, SEPTA, on January 8, 1993, moved for summary judgment, arguing that these cases had, in effect, already been resolved because they could not be distinguished from *Amtrak I.* At about the same time, the three defendants—the PUC, Lower Merion, and Upper Gwynedd—also moved for summary judgment, presenting a number of reasons why judgment should be entered against SEPTA.[4] Thereafter, all parties responded to the opposing motions for summary judgment. Defendants' arguments for summary judgment in their favor and/or to resist summary judgment in favor of SEPTA fall into three categories: (1) deference to state policies and proceedings; (2) the unconstitutionality of § 581(c)(5); and (3) the inapplicability of § 581(c)(5) to the cases at bar (or, at least, factual uncertainty surrounding that statute's applicability). I will address each of these arguments in turn.

■ The standards for granting or denying summary judgment do not change by virtue of cross-motions being presented. *United States v. Hall,* 730 F.Supp. 646, 648 (M.D.Pa.1990). Therefore, the question now—as always at the summary judgment stage—is whether, provided there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II.

*Deference to State Policy and Proceedings*

The PUC and Lower Merion recommend that this court decline to exercise its jurisdic-

---

3. *See Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n,* 140 Pa.Cmwlth. 270, 592 A.2d 797 (1991), *appeal denied by* 531 Pa. 642, 611 ·A.2d 714 (1992), and *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n,* 140 Pa.Cmwlth. 292, 592 A.2d 808 (1991), *appeal denied by* 531 Pa. 642, 611 A.2d 714 (1992).

4. Some of the defendants re-presented their arguments that either the Tax Injunction Act or the Eleventh Amendment robs this court of jurisdiction over these cases. Nothing presented by any of the defendants provokes me to reconsider my previous opinion denying defendants' motions to dismiss for lack of subject-matter jurisdiction (in which substantially the same arguments were raised).

tion pursuant to either *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In considering the possibility of abstention, it is important to keep in mind that

> [a]bstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."

*Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959)). These cases do not present one of those limited circumstances where a district court should decline to exercise its jurisdiction in deference to state policies (pursuant to *Burford* ) or to pending state proceedings (pursuant to *Colorado River* ).

### A. *Burford* Abstention

■ Under the *Burford* doctrine, "[i]f the exercise of·federal review would be disruptive of state efforts to establish a coherent policy, and the policy concerns complicated local matters, abstention may be justified." *United Servs. Auto. Ass'n v. Muir,* 792 F.2d 356, 364 (3d Cir.1986), *cert. denied sub nom. Grode v. United Servs. Auto. Ass'n,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987). In *Burford* itself, the Court held that a federal district court should decline to review the Texas Railroad Commission's grant of a permit to drill oil wells where the question was whether the Commission had properly applied complex state regulations and where the state had set up a thorough system of judicial review of such administrative determinations. Under those circumstances, the Court concluded, "a sound respect for the independence of state action requires the federal equity court to stay its hand." 319 U.S. at 334, 63 S.Ct. at 1107. Defendants argue that because the PUC has power to allocate maintenance responsibilities for rail-highway crossings and a unique ability to assess the benefits flowing to each interested

party from a particular crossing, and because enjoining the PUC orders would disrupt its sensible allocation of maintenance responsibilities, this court should, under *Burford,* stay clear of reviewing the PUC orders.

■ "While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 359, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (*NOPSI* ) (quoting *Colorado River,* 424 U.S. at 815–16, 96 S.Ct. at 1245). For one, the *Burford* doctrine does not pertain if it is clear that federal law has pre-empted state regulatory authority in a particular area. 17A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4244, at 93–94 (1988). Further, when a defendant urges abstention for fear of disruptive effect on state regulatory policy, the defendant must show that the federal court is presented with claims implicating local concerns that fall within the technical or specialized expertise of the state administrative body. *See, e.g., United Servs.,* 792 F.2d at 365 (finding that district court erred in applying *Burford* to state regulation of insurance where the party urging abstention "has not suggested any peculiar local conditions or special expertise required to interpret the. [state] statute"); *Baltimore Bank for Coops. v. Farmers Cheese Coop.,* 583 F.2d 104, 110 (3d Cir.1978) (district court erred in abstaining on basis of *Burford* where "[n]o special expertise or competence" of the agency involved); *accord Property & Casualty Ins., Ltd. v. Central Nat'l Ins. Co. of Omaha,* 936 F.2d 319, 323 (7th Cir.1991) (footnote omitted) (where abstention is urged for fear of disruption of coherent state policy, the state forum "must stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims."). SEPTA, far from asking this court to assess the reasonableness of the PUC orders against the backdrop of unclear state law or complicated state policies within the special competence of the PUC, simply asks

for a construction of federal law—§§ 581(c)(5) and 546b—and a ruling that the several PUC orders are foreclosed by this federal legislation. Where, as here, no issues of peculiar local concern are required to interpret the allegedly pre-empting federal law, there is no reason for abstention on *Burford* grounds because there is no significant intrusion into state governmental processes. *Cf. NOPSI,* 491 U.S. at 363, 109 S.Ct. at 2515 (*Burford* abstention not appropriate where "no inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is facially pre-empted by FERC's allocative decree and relevant provisions of the Federal Power Act."). Although federal review may result in an injunction against enforcement of PUC orders, "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978).

In short, any disruptive effect on state policy in these cases would flow from a federal legislative design rather than from federal judicial oversight of issues of distinctive local concern. For this reason, it would be manifestly inappropriate to abstain in order to avoid what defendants perceive as "needless" conflict with state policy; where Congress has afforded an exemption from state taxation, any conflict with a State's affairs that this engenders cannot be viewed by this court as "needless." Therefore, I will not abstain on *Burford* grounds.

### B. *Colorado River* Deference

■ Nor is this a case where it would be appropriate to decline to exercise jurisdiction under *Colorado River.* In *Colorado River,*

the Court recognized that there are "exceptional" circumstances where it may be appropriate for a federal court to withhold jurisdiction because of a pending state proceeding in order to preserve judicial resources and avoid piecemeal litigation. 424 U.S. at 818, 96 S.Ct. at 1246. Because *Colorado River* deference is not based on "weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." *Id.* "Only the clearest of justifications will warrant dismissal" on this basis, *id.* at 819, 96 S.Ct. at 1247, and the balance is "heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983).[5]

■ Concern for judicial resources, far from supporting deference to the state proceedings, actually advises against such deference. Although the record before me is not at all clear as to the relevant procedural history in state court, it appears that, shortly after each of the three PUC orders was entered (on December 10, 1991, January 21, 1992, and June 2, 1992), and contemporaneously with the filing of each of these three federal actions (on January 8, 1992, February 19, 1992, and June 30, 1992), SEPTA filed a petition for review in the Pennsylvania Commonwealth Court in order to protect its right to appeal in the event of losing in federal court. Shortly after each state appeal was filed, SEPTA, as defendants acknowledge, was granted a stay pending resolution of the related federal proceeding. The PUC and

---

**5.** The Court, in *Colorado River* and *Moses H. Cone Memorial Hosp.,* has identified a number of factors for a federal district court to consider in deciding whether to stay its proceedings in deference to pending state proceedings. These include: (1) whether either court has assumed jurisdiction over a *res;* (2) the relative convenience of the forums; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction, *see Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246; (5) whether state or federal law is controlling; and (6) whether the state proceeding is adequate to

protect the parties rights, *see Moses Cone,* 460 U.S. at 25–26, 103 S.Ct. at 941–42. "These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a 'mechanical checklist.'" *American Int'l Underwriters, (Philippines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253, 1257 (9th Cir.1988) (quoting *Moses H. Cone Memorial Hosp.,* 460 U.S. at 16, 103 S.Ct. at 937). Following this authoritative guidance, I only balance in the text those factors that seem to me important in these cases at bar—all of which factors seem to point toward the exercise of jurisdiction.

Lower Merion suggest that a reason to defer to the state proceedings is that SEPTA first filed appeals to the Pennsylvania Commonwealth Court and only thereafter commenced these federal actions. Even assuming that the petitions for review to the Commonwealth Court preceded the filing of each of the federal complaints—an assumption that appears open to substantial question [6]—since the ultimate concern is the conservation of judicial resources, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 21, 103 S.Ct. at 940. There is no indication that any proceedings of consequence took place in state court before the appeals were stayed. (In fact, the staying of the related state-court proceedings is itself reason for this court not to abstain. *See Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 569, 103 S.Ct. 3201, 3215, 77 L.Ed.2d 837 (1983) ("[F]ederal courts need not defer to the state proceedings if the state courts expressly agree to stay their own consideration of the issues raised in the federal action pending disposition of that action.")). Moreover, this court has already issued an opinion deciding that it has subject-matter jurisdiction over the cases and that SEPTA has stated a cognizable claim. Only thereafter (in January 1993—from seven months to one year after each complaint was filed) did the PUC and Lower Merion file motions urging abstention. Where the defendants first request the surrender of jurisdiction long after they were served with the federal complaint, after having filed unsuccessful motions to dismiss, and after the deadline for discovery has passed—i.e., after substantial progress has been made in the federal proceeding—*Colorado River* deference appears inappropriate from the perspective of judicial economy. *See Moses H. Cone Memorial Hosp.* 460 U.S. at 16, 103 S.Ct. at 937 (reading *Colorado River* as directing inquiry towards whether "substantial progress" has been made in the federal-court litigation); *Mobil Oil Corp. v. City of Long Beach*, 772 F.2d 534, 542 (9th Cir.1985) (dismissal of federal action inappropriate where issues before the district court had been fully briefed and the state action had been stayed).

Defendants also argue that this court should abstain to avoid piecemeal litigation. As the PUC puts it, "Piecemeal litigation results when different courts consider the same issue, duplicating efforts and reaching different results." PUC's Mem. in Sup. at 29; *see American Int'l*, 843 F.2d at 1258. It is difficult to see how such duplication will result if this court continues to exercise jurisdiction over these cases. Because the state-court proceedings have been stayed until these proceedings are finished, there will be no duplication of efforts in the interim. Moreover, if, at the conclusion of this proceeding, this court were to enjoin the PUC from enforcing its orders, there would, of course, be no need for SEPTA to return to state court and no occasion for defendants to do so. If, by contrast, this court were to decide that § 581(c)(5) does not constitute a basis for enjoining PUC enforcement of its orders, SEPTA might, at that time, then return to the state court to assert that the assignment of costs to SEPTA constituted an abuse of discretion under state law (or some other state-law violation). However, even in that event there would be no re-adjudication of identical issues because this court has not been asked to address the reasonableness of the PUC determination under state law.[7]

Finally, it is significant also that the issue here is the scope of a federal right.

---

6. There is reason to doubt the defendants' chronology. SEPTA's petition for review to the Pennsylvania Commonwealth Court from the December 10, 1991 PUC order (attached as an exhibit to the PUC's earlier-filed Motion to Dismiss for Lack of Subject–Matter Jurisdiction in Civ. A. No. 92–0112) is dated January 9, 1992—one day *after* the federal complaint seeking to enjoin enforcement of the December 10, 1991 PUC order (in Civ. A. No. 92–0112) was filed. Similarly, SEPTA's state-court petition for review from the January 21, 1992 PUC order (attached as an exhibit to the PUC's earlier-filed Motion to Dis-

miss for Lack of Subject–Matter Jurisdiction in Civ. A. No. 92–1029) is dated February 20, 1992—again one day *after* the related federal complaint was filed. I cannot find anything in the record as to when the state petition for review paralleling the third federal complaint (Civ. A. No. 92–3793, filed June 30, 1992) was brought.

7. Were SEPTA to lose in this court (and on appeal, if any), SEPTA presumably could not represent the § 581(c)(5) argument in state court because, under Pennsylvania law,

*See Moses H. Cone Memorial Hosp.*, 460 U.S. at 26, 103 S.Ct. at 941 ("[T]he presence of federal-law issues must always be a major consideration weighing against surrender [of jurisdiction]."). Defendants posit that SEPTA has effectively forfeited its right to a federal adjudication of the scope of its federal tax immunity by filing protective petitions for review in state court. Preservation of the right to appeal an adverse state administrative determination should not have as its price the surrender of access to a competent federal forum for adjudication of federal claims. To treat the mere presence of a related state proceeding (even where that proceeding has been stayed) as reason enough for a federal court to withhold jurisdiction would be precisely to impose that intolerable cost on the filing of a protective state appeal and might force litigants against their will into state forums.[8]

For all of these reasons, I decline to withhold jurisdiction on the basis of *Colorado River*, as I have also declined to dismiss these complaints on *Burford* grounds.

> [w]hen a court of competent jurisdiction has determined a litigated cause on its merits, the judgment entered and not reversed on appeal is, as between the parties to the suit and their privies, final and conclusive with regard to every fact which might properly be considered in reaching a judicial determination and with regard to all points of law adjudged as those facts and points of law relate directly to the cause of action in litigation.
>
> *Stevenson v. Silverman*, 417 Pa. 187, 208 A.2d 786, 788 (emphasis and citation omitted), *cert. denied*, 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965).

8. The PUC argues that this court should withhold jurisdiction because the Pennsylvania Commonwealth Court has previously ruled that bridge-maintenance costs can be allocated to SEPTA without violating § 581(c)(5). See *supra* note 3. Therefore, according to the PUC, SEPTA is now simply engaging in forum shopping. While forum shopping may be a ground to consider under *Colorado Review*, "there is no doctrine of abstention or deference that authorizes a federal court to decline to exercise jurisdiction on the ground of forum shopping alone." Wright and Miller, *supra*, § 4247, at 9 (Supp.1992) (footnote omitted). Moreover, the Pennsylvania Commonwealth Court, in those rulings, expressly declined to follow the Third Circuit's interpretation of the phrase "taxes or other fees." See 592 A.2d at 803 n. 12 ("We disagree with the Third Circuit that a 'special assessment' is a tax"). Therefore, since this court is bound by the Third Circuit's

## III.

### The Constitutionality of § 581(c)(5)

 ▪The PUC presents two reasons why § 581(c)(5) should be declared unconstitutional. First, it argues that § 581(c)(5) was not within Congress' authority under the Commerce Clause because Congress lacked a rational basis for finding that an exemption of local commuter authorities from state and local taxes furthers interstate commerce. Alternatively, the PUC argues that, assuming Congress acted within its powers under the Commerce Clause in enacting § 581(c)(5), the statute nevertheless invades the core of state sovereignty reserved by the Tenth Amendment (at least as applied to SEPTA) by interfering with the Commonwealth's right to control SEPTA.[9]

### A. The Commerce Clause

 Because "the Commerce Clause is a grant of plenary authority to Congress," determinations of federal law and must regard them as "correct"—and, *a fortiorari*, more correct than contrary rulings by state courts—it would be inappropriate for me to penalize SEPTA for having sought a federal forum that has proven more hospitable to federal claims analogous to those it now asserts.

9. The PUC also argues that Congress exceeded its powers under the Commerce Clause in enacting § 581(c)(5) because the local commuter authorities immunized from state and local taxes are neither federal entities nor contractors with the federal government. This argument can be quickly dismissed. Based on a line of precedent beginning with the venerable *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819), the federal government and its instrumentalities are absolutely immune from direct state taxation under the Supremacy Clause. SEPTA's concededly local status, while it would appear to *attenuate any argument that SEPTA might be* exempt from state taxes by virtue of the Supremacy Clause alone, does not remove from Congress, in the exercise of its delegated commerce powers, the power expressly to confer upon SEPTA an immunity beyond that set by the Constitution itself. See *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 422, 66 S.Ct. 1142, 1151, 90 L.Ed. 1342 (1946) ("[I]n all the variations of commerce clause theory it has never been the law that what the states may do in the regulation of commerce, Congress being silent, is the full measure of its power.").

*Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981), "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow," *id.* The court must determine only whether Congress acted rationally in adopting a particular regulatory scheme— i.e., that there is a "rational basis" for a congressional finding that the regulated activity affects interstate commerce, *id.,* and, second, that the means chosen by Congress were " 'reasonably adapted to the end permitted by the Constitution,' " *id.* (citation omitted).

■■■■ Notwithstanding the PUC's objection that Congress made no explicit findings that the regulated activity affects interstate commerce—which is not required, *Katzenbach v. McClung,* 379 U.S. 294, 299, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964)—Congress' belief that state taxation interferes with interstate commerce can be gleaned from the legislative history of § 546b and the clear import of § 581(c)(5) itself. As has already been discussed, *see supra* p. 4 and 802 F.Supp. at 1278, Congress exempted Amtrak and its subsidiary Amtrak Commuter from state taxation in part because of concern that such taxation threatened Amtrak's continued existence and, with it, the provision of nationwide rail passenger service. Congress evidently believed that when local commuter authorities took over from Conrail the operation of commuter rail lines that were operated at a consistent loss, state taxation would diminish the ability of these entities to provide effective commuter rail service. It can scarcely be doubted that Congress had reason to believe that the imposition of state and local "taxes or other fees" on an entity engaged in interstate transport,[10] by diverting funds away from operations, has a restrictive effect on that entity's ability to perform its interstate commercial

functions effectively—particularly where that same commuter service had previously been operated without profit despite massive federal investment. *Cf. National R.R. Passenger Corp. v. New Castle County,* 633 F.Supp. 354, 361 (D.Del.1986) (§ 546b is within Congress' Commerce Clause power "[b]ecause Congress had a rational basis for concluding that State and local taxes interfere with Amtrak's ability to provide improved intercity rail passenger service . . .").

■■■■ The PUC argues that § 581(c)(5) was not reasonably calculated to achieve the goal of sustaining and improving commuter rail service because "SEPTA's financial security can hardly be secured by 45 U.S.C. § 581(c)(5)." PUC's Mem. in Sup. at 24. However, the question is not whether tax exemption guarantees the survival of the exempted commuter rail authorities but whether, when state and local taxes are reasonably found to place a drag on interstate commerce, the elimination of those taxes is a reasonable method of facilitating interstate commerce. *Cf. Arizona Pub. Serv. Co. v. Snead,* 441 U.S. 141, 150, 99 S.Ct. 1629, 1634, 60 L.Ed.2d 106 (1982) (Congress could invalidate state tax because it "had a rational basis for finding that the New Mexico tax interfered with interstate commerce, and selected a reasonable method to eliminate that interference."). While Congress might have proceeded in other ways, and the PUC might question the wisdom of Congress' decision to eliminate state and local taxes on local commuter authorities, Congress' power to protect "interstate commerce against state regulation or taxation . . . is so complete that its ideas of policy should prevail." *State Bd. Of Ins. v. Todd Shipyards Corp.,* 370 U.S. 451, 456, 82 S.Ct. 1380, 1384, 8 L.Ed.2d 620 (1962) (footnote omitted); *see also Stafford v. Wallace,* 258 U.S. 495, 521, 42 S.Ct. 397, 403–04, 66 L.Ed. 735 (1922) (the Court indicating that it would "certainly not substitute its

---

10. SEPTA notes that its commuter service operates directly between Philadelphia, Pennsylvania and Trenton, New Jersey and, therefore, that it is engaged in interstate commerce. The PUC does not dispute that SEPTA is engaged in interstate rail service. In any event, Congress' authority under the Commerce Clause extends even to a local transit system engaged in intrastate commerce activity, provided that those intrastate activities affect interstate commerce. *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 537, 105 S.Ct. 1005, 1010, 83 L.Ed.2d 1016 (1985); *Hodel,* 452 U.S. at 281, 101 S.Ct. at 2362; *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942).

judgment for that of Congress [in selecting a means of eliminating an activity having a detrimental effect on interstate commerce] unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent.")

In sum, I find that Congress (1) had a rational basis for believing that state and local assessments interfered with the provision of historically unprofitable commuter rail service within and across state lines, and (2), by eliminating such assessments, selected a rational means of improving such service. It is not the province of this court to substitute its judgment for that of Congress.

### B. The Tenth Amendment and Intrusions on State Sovereignty

 The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people." U.S. Const. amend. X. The PUC's position that Congressional exemption of a railroad from state taxation impermissibly intrudes on the States' traditional powers has been rejected by other courts in situations closely analogous to the case at bar. In *New Castle County, supra,* the court concluded that § 546b did not violate the Tenth Amendment because Congress acted within its express powers under the Commerce Clause in exempting Amtrak from state taxation and because the Court, in *Garcia v. San Antonio Metro. Transit Auth.,* 469

U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), had decided that the Tenth Amendment does not impose any independent limitation on Congress' power to legislate under the Commerce Clause. Similarly, in *New Jersey v. Consolidated Rail Corp.,* 690 F.Supp. 1061 (Sp.Ct.R.R.R.A.1988), the court decided that Congress has the power to exempt Conrail from state taxation because

> the power of Congress over interstate commerce is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution, and *Garcia* has removed the Tenth Amendment as a substantive limitation within the Constitution to Congress' power to legislate upon the States as States . . .

690 F.Supp. at 1066. In the case at bar, however, the PUC's Tenth Amendment argument may be stronger than that advanced in either of the aforementioned cases because (1) the Court recently has at least partially reclaimed what was lost in the wake of *Garcia* and declared that concerns for state sovereignty, as reflected in the Tenth Amendment, may impose limitations on Congress' Article I powers to order a State's regulatory structure, *see New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); and (2) SEPTA, unlike Amtrak and Conrail (both corporations established by Congress), is a state-created enterprise the regulation of which, arguably, is a more fundamental attribute of state sovereignty.[11]

---

11. SEPTA was created pursuant to the Metropolitan Transportation Authorities Act of 1963. Act of August 14, 1963, P.L. 984, No. 450 (codified as amended at 66 Pa.Stat.Ann. §§ 2001–2043 (Purdon Supp. 1975 (repealed 1980)), *reenacted and recodified* as the Pennsylvania Urban Mass Transportation Law, 55 Pa.Stat.Ann. §§ 600.301–.407 (Purdon Supp. 1987 (repealed 1991)), *reenacted and recodified* at 74 Pa.Stat.Ann. §§ 1501–1543 (Purdon Supp.1992). SEPTA is currently governed by the Public Transportation Law, 74 Pa. Stat.Ann. §§ 1501–1543 (Purdon Supp.1992). Section 1502 of that law—a recodification of the law pursuant to which SEPTA was originally created—provides for the creation of transportation authorities such as SEPTA on the following terms:

> There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the trans-

portation authority of such area, extending to and including all of the territory in the metropolitan area. An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.

74 Pa.Stat.Ann. § 1502(a). Given this statement of purpose in SEPTA's charter, the Pennsylvania Supreme Court has had "no hesitation in concluding that SEPTA was intended to be considered an agency of the Commonwealth." *Feingold v. Southeastern Transp. Auth.,* 512 Pa. 567, 517 A.2d 1270, 1276 (1986) (punitive damages could not be assessed against SEPTA given its status as a Commonwealth agency); *see also Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n.,* 140 Pa.Cmwlth. 270, 592 A.2d 797, 803 (1991), (referring to SEPTA as a

Still, I conclude that because Congress is in no sense commandeering state regulatory processes through § 581(c)(5) and because Congress' power to protect interstate rail transport against state taxation and regulation is so complete, the Tenth Amendment does not work to invalidate § 581(c)(5) (either generally or as specifically applied to SEPTA).

In *New York, supra,* the Court indicated that the Federal Government's power to command state legislatures to legislate is limited by the Tenth Amendment's respect for state sovereignty. Observing that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions," —— U.S. at ——, 112 S.Ct. at 2421, the Court struck down a portion of the Low–Level Radioactive Waste Policy Amendments of 1985 directing the States to either regulate radioactive waste disposal according to Congressional mandate or assume ownership of such waste and all liability that waste generators might incur due to the State's failure to follow the Congressional directive. Either "choice," the Court observed, "would 'commandeer' state governments into the service of federal regulatory purposes, and would for this reason be inconsistent with the Constitution's division of authority between federal and state governments." *Id.* —— U.S. at ——, 112 S.Ct. at 2428. The Court concluded, "Whatever the outer limits of [a State's] sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* —— U.S. at ——, 112 S.Ct. at 2435.

■ The PUC argues that Congress, by interfering with the Commonwealth's ability to apportion maintenance costs at rail-highway crossings, has, contrary to *New York,* attempted to use state regulatory machinery to advance federal goals. But the PUC reads too much into *New York.* That opinion does not hold that, whenever a state regulatory body is required to follow federal guidelines, there is a Tenth Amendment problem. Rather, *New York* stands for a much more limited proposition: that when Congress desires to regulate, it must do so directly and cannot enlist the States to do its bidding. However, § 581(c)(5) does not employ the Commonwealth as a regulatory agency—i.e., does not compel the State to require or prohibit any acts—but merely directs the States to refrain from engaging in a certain form of regulation deemed inconsistent with cognizable federal interests. Even in the heyday of the Tenth Amendment, when *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), was still good law,[12] the Court emphasized that

"state agency"), *appeal denied by* 531 Pa. 642, 611 A.2d 714 (1992); *Southeastern Pa. Transp. Auth. v. Board for the Assessment and Revision of Taxes of Delaware County,* 13 Pa.Cmwlth. 207, 319 A.2d 10, 12 (1974) (calling SEPTA "an instrumentality of the Commonwealth"). Further, the Third Circuit has regarded SEPTA as a "Commonwealth party" for purposes of state sovereign immunity, *see Toombs v. Manning,* 835 F.2d 453 (3d Cir.1987), and a political subdivision of the Commonwealth exempt under the Wagner and Taft Hartley Acts, *see Crilly v. Southeastern Pa. Transp. Auth.,* 529 F.2d 1355 (3d Cir.1976). On the other hand, in denying Eleventh Amendment immunity to SEPTA, the Third Circuit recently noted that SEPTA has many characteristics unlike an arm of the state—such as separate corporate existence, the power to sue and enter contracts, and considerable funding from sources other than the Commonwealth. *Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807, 820 (3d Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); *see also Scott v. Shapiro,* 19 Pa.

Cmwlth. 479, 339 A.2d 597 (1975) (SEPTA not treated as Commonwealth agency within meaning of the jurisdictional provisions of Pennsylvania's sunshine laws).

12. In *National League of Cities,* a five-member majority of the Court—locating principles of state sovereignty in the Tenth Amendment—overrode Congressional legislation extending the federal minimum wage and maximum hour provisions to state and municipal employees. Such federal legislation, the Court held, unduly intruded upon traditional state functions. Nine years later, in *Garcia, supra,* Justice Blackmun, who had voted with the *National League of Cities* majority, joined the four *National League of Cities* dissenters in reversing *National League of Cities.* The *Garcia* majority "reject[ed], as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'" 469 U.S. at 546–47, 105 S.Ct. at 1015.

the Federal Government may displace state regulation even though this serves to "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important." *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 759, 102 S.Ct. 2126, 2137, 72 L.Ed.2d 532 (1982) (quoting *Hodel,* 452 U.S. at 290, 101 S.Ct. at 2367; *see also Hodel,* 452 U.S. at 292, 101 S.Ct. at 2368 ("It would ... be a radical departure from long-established precedent for this Court to hold that the Tenth Amendment prohibits Congress from displacing state police power laws regulating private activity."); *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234 (1947) (Congress "can, if it chooses, entirely displace the States to the full extent of the far-reaching Commerce Clause...."); *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520–21, 89 L.Ed. 1915 (1945) (Congress may "exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce"). In *New York* itself, the Court reiterated that "[t]he Constitution enables the Federal Government to pre-empt state regulation contrary to federal interests...." —— U.S. at ——, 112 S.Ct. at 2435.[13]

 The fact that pre-emptive federal legislation may impinge on a state revenue-raising scheme has no special Tenth Amendment implications. Congress' authority to prohibit state taxation as an incident of the exercise of its delegated powers is well-entrenched—dating back, one might argue, to *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819), where Chief Justice Marshall, in holding that Maryland could not tax bank notes issued by the Baltimore branch of the Congressionally-chartered Second Bank of the United States, penned the memorable phrase "the power to tax involves the power to destroy." [14] What is true of Congress' delegated powers generally is specifically true of its commerce powers. *See Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 679, 65 S.Ct. 870, 883, 89 L.Ed. 1252 (1945) ("Congress through the commerce clause, possesses the same power of control of state taxation of all merchandise moving in interstate or foreign commerce."); *Arizona v. Atchison, T. & S. Fe R.R.,* 656 F.2d 398, 407 (9th Cir.1981) ("We know of no authority for the proposition that Congress may not interfere with state taxation in furtherance of its power over interstate commerce."); *Department of Revenue and Taxation v. National R.R. Passenger Corp.,* No. Civ.A. C82–0320–H, 1982 WL 1584 (D.Wyo. Dec. 15, 1982) ("Restricting the areas in which a state may exercise its taxing powers does not rise to the level of interference which would invalidate the congressional enactments."); *Arkansas–Best Freight Sys., Inc. v. Cochran,* 546 F.Supp. 904, 910 (M.D.Tenn.1981) ("[T]he constitutional power of Congress under the commerce clause clearly permits some limitation on the states' power of taxation. As long as the legislation is rationally related to the goal of protecting

---

**13.** Congress' power to displace state regulation of railroads affecting interstate commerce has a particularly lengthy pedigree. *See, e.g., Wabash, St. L. & Pac. Ry. Co. v. Illinois,* 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244 (1886) (Congress can displace a State's power to regulate the interstate rates of railroads); *United States v. Louisiana,* 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933) (same for intrastate rates); *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Moreover, even in the absence of conflicting federal legislation, the Commerce Clause of its own force has repeatedly been held to preclude state regulation of railroads. *See, e.g., Seaboard Air Line Ry. v. Blackwell,* 244 U.S. 310, 37 S.Ct. 640, 61 L.Ed. 1160 (1917) (State could not require interstate railroad to stop at grade crossing because interference with interstate commerce outweighed local interest in safety); *Kansas City S. Ry. Co. v. Kaw Valley,* 233 U.S. 75,

34 S.Ct. 564, 58 L.Ed. 857 (1914) (despite valid local concerns, State lacks constitutional power to compel a railroad to remove a railroad bridge over which its interstate trains passed, given dominant requirements of interstate commerce); *see generally Southern Pac. Co.,* 325 U.S. at 780–81, 65 S.Ct. at 1525–26 (listing numerous cases in which local police-power legislation of interstate railroads was forced to yield to interstate commerce interests).

**14.** *McCulloch,* of course, is a case where Congress, in establishing the federal bank, had not expressly decreed that the bank's operation should be exempt from taxation, and the Court made that pre-emptive implication unaided by express statutory language, based on the Supremacy Clause. *See supra* note 9.

interstate commerce or the instrumentalities thereof, the mere fact that a state taxation scheme is affected does not itself invalidate the legislation."); cf. *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 280, 98 S.Ct. 2340, 2348, 57 L.Ed.2d 197 (1978) ("[The] legislative power granted to Congress by the Commerce Clause of the Constitution would amply justify the enactment of legislation requiring all States to adhere to uniform rules for the division of income.").[15]

▇▇▇ Therefore, it is clear that Congress can, in furtherance of its commerce power, displace state taxation and state police-power regulation of private activity. However, the PUC, by stressing SEPTA's status as a public agency, suggests that § 581(c)(5) is somehow more intrusive because it interferes with the Commonwealth's ability to structure and control its own sovereign operations. The problem with this argument is two-fold. First, even when the Court was invigorating the Tenth Amendment, in *National League of Cities,* the Court indicated that ownership or operation of an interstate railroad is not an integral part of a State's sovereign activities, *see* 426 U.S. at 854 n. 18, 96 S.Ct. at 2475 n. 18,[16] thereby leaving intact a body of opinions affirming Congress' power under the Commerce Clause to displace state regulation of state-owned railroads engaged in interstate

commerce, *see California v. Taylor,* 353 U.S. 553, 566–67, 77 S.Ct. 1037, 1044–45, 1 L.Ed.2d 1034 (1957) (Congress may supersede state labor laws that conflict with Congressional policy of promoting collective bargaining, even with respect to interstate railroads owned or operated by the State); *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936) (deciding that it is unimportant to determine whether a state-owned railroad is conducted by State in its sovereign or private capacity because State, by engaging in interstate rail commerce, subjects itself to Congress' commerce power; therefore, state-owned railroad subject to federal safety standards).[17] Therefore, insofar as Congress can exempt a privately-owned interstate railroad from state taxation, provided there is some valid federal interest in doing so, it must have similar power over a state-controlled railroad because "there is no justification for a rule which would allow the states, by acquiring functions previously performed by the private sector, to erode federal authority in areas traditionally subject to federal statutory regulation." *Transportation Union v. Long Island R.R. Co.,* 455 U.S. 678, 687, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982).[18]

▇▇▇ In any event, the PUC's argument seems to rely on the so-called "traditional government functions" prong of the *National*

---

**15.** Indeed, the Commerce Clause, standing alone, imposes certain restrictions on the States' power to tax. *See, e.g., Freeman v. Hewit,* 329 U.S. 249, 252–53, 67 S.Ct. 274, 276–77, 91 L.Ed. 265 (1946) ("[T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States ... [R]evenue serves as well no matter what its source. To deny to a State a particular source of income because it taxes the very process of interstate commerce does not impose a crippling limitation on a State's ability to carry on its local function.").

**16.** *See also Transportation Union v. Long Island R.R. Co.,* 455 U.S. 678, 686, 102 S.Ct. 1349, 1354, 71 L.Ed.2d 547 (1982) (emphasis in original) ("It is certainly true that some passenger railroads have come under state control in recent years, but that does not alter the historical reality that the operation of railroads is not among the functions *traditionally* performed by the state and local governments."). Moreover, the Court has also emphasized "the extended historical record of *federal* involvement in the field of rail transportation." *Garcia,* 469 U.S. at 540, 105

S.Ct. at 1012 (emphasis in original) (discussing *Long Island R.R.*).

**17.** Nor, for that matter, as the discussion heretofore has suggested, is taxation of an instrumentality of interstate commerce an indisputable attribute of state sovereignty. *See Atchison,* 656 F.2d at 408 ("Power, including the power to tax, over instrumentalities of interstate commerce has not traditionally been limited to the states, and thus is not truly an integral part of state sovereignty.").

**18.** *Cf. Helvering v. Powers,* 293 U.S. 214, 225, 55 S.Ct. 171, 173, 79 L.Ed. 291 (1934) (upholding the application of a federal income tax on a state-operated commuter railroad because "the State cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend").

*League of Cities* test that the Court express-
ly rejected in *Garcia.*[19] Before *National
League of Cities,* and again since its disavow-
al by the Court in *Garcia,* the Court has
repeatedly allowed Congress to supersede a
state's governance of its own enterprises:
*e.g.,* forbidding a state government to provide
salary and wage increases to its own employ-
ees, *Fry v. United States,* 421 U.S. 542, 95
S.Ct. 1792, 44 L.Ed.2d 363 (1975); requiring
a public mass transit authority, as well as
state-run schools and hospitals, to adhere to
federal minimum wage and overtime obli-
gations, *Garcia v. San Antonio Metropolitan
Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005,
83 L.Ed.2d 1016 (1985); *Maryland v. Wirtz,*
392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020
(1968); prohibiting states from issuing bear-
er bonds, *South Carolina v. Baker,* 485 U.S.
505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988);
and applying emergency price controls to
state sales of lumber, *Case v. Bowles,* 327
U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946).
Therefore, even insofar as § 581(c)(5) forces
the Commonwealth to cede some control over
a state instrumentality and its finances, this
does not itself mean that § 581(c)(5) unduly
infringes on state sovereignty.

## IV.

### *The Applicability of Section 581(c)(5)*

Section 581(c)(5) provides that:

> any commuter authority that could have
> contracted with Amtrak Commuter for the
> provision of commuter service but which
> elected to operate directly its own commut-
> er service as of January 1, 1983, shall be
> exempt from the payment of any taxes or
> other fees to the same extent as [Amtrak]
> is exempt.

The defendant townships argue that
§ 581(c)(5) does not prevent the PUC from
allocating to SEPTA maintenance costs for
the subject bridges because (1) SEPTA is not
a "commuter authority that could have con-
tracted with Amtrak Commuter," and (2) the
costs in question are not "taxes or other
fees."

### A. The Potential to Contract with Am-
trak Commuter

█ SEPTA, on March 24, 1982, issued a
statement of intention to contract with Am-
trak Commuter for the provision of commut-
er service; however, on September 22, 1982,
the SEPTA Board of Directors voted to re-
scind that statement and undertake the pro-
vision of commuter services directly. While
allowing that SEPTA is a "commuter author-
ity," *see* 45 U.S.C. § 502(8) (listing SEPTA
as one of seven entities falling with the defi-
nition of "commuter authority"), the town-
ships argue that SEPTA could *not* "have
contracted with Amtrak Commuter" because
SEPTA Board members realized that to do
so would have subjected SEPTA to certain
increased labor costs that it could not have
afforded. As support for this proposition,
the townships rely on the following testimony
from Robert J. Thompson, a former SEPTA
Board member:

> To my recollection, the only reason, the
> compelling reason [for SEPTA] to go at it
> alone ... with commuter service was the
> cost of complying with the work rules and
> [labor] contracts that were in existence. It
> was a dollar and cents cost.... [T]he
> only way that the elected officials and the
> SEPTA Board felt that they could afford
> to continue the service, a very valuable
> service, was to renegotiate the contracts
> and operate it ourselves.

Lower Merion's Mot. in Sup., Exh. C. at 16.
From this testimony, defendants gather that
"[t]he decision not to contract with Amtrak
Commuter was not an independent election
between two options, but rather the only
alternative to avoid crippling labor mandates
and keep the commuter rail system afloat."
Lower Merion's Mem. in Sup. at 16.

Defendants have provided no reason to
believe that Congress intended the phrase
"could have contracted with Amtrak Com-
muter" to eliminate from § 581(c)(5)'s cover-
age some commuter authorities that instead
assumed direct operation of commuter rail
lines formerly handled by Conrail. By enact-
ing § 581(c)(5) in the wake of § 546b, Con-
gress, in my view, intended to provide a tax-
exempt status to any entity that, as of Janu-

**19.** *See supra* note 12.

ary 1, 1983, began directly to operate commuter rail operations formerly handled by Conrail, whether that entity was Amtrak Commuter or a local commuter authority. Therefore, the phrase "could have contracted with Amtrak Commuter for the provision of commuter service but which elected to operate directly its own commuter service" was designed to cover any commuter authority that was offered a chance to contract with Amtrak Commuter (i.e., "could have contracted with Amtrak Commuter") but proceeded to provide such service directly. This interpretation is consistent with the genesis of Amtrak Commuter, which was designed to assist local authorities in dealing with the newly-transferred commuter rail operations, and the fact that local authorities were offered a choice between contracting with Amtrak Commuter or operating those services themselves. After having granted Amtrak Commuter a tax exemption, Congress, through § 581(c)(5), plainly desired to insure that no commuter rail authority would be penalized by declining to deal with Amtrak Commuter. To exclude from § 581(c)(5) a commuter authority that was presented with the option of contracting with Amtrak Commuter but—for whatever reason—did not do so would be to defeat Congress' intention that local agencies operating Conrail's former lines stand on the same tax-exempt footing as Amtrak and Amtrak Commuter.

■ Even assuming, *arguendo*, that the phrase "could have contracted" was meant to excise from § 581(c)(5)'s coverage some subset of commuter authorities that came to operate commuter service directly, it could only have been designed to exclude those entities that, when presented with a choice to contract with Amtrak Commuter, simply could not have exercised that option. SEP-

TA did not encounter any legal or other formal constraint on its ability to contract with Amtrak Commuter. Rather, the testimony relied on by defendants at most demonstrates that SEPTA, having assessed the financial implications of contracting with Amtrak Commuter, determined that entering into such a contract would be too costly. *See* Upper Gwynedd's Mem. in Sup. at 6 ("The record indicates that SEPTA chose not to contract with Amtrak Commuter Services to operate SEPTA trains due to the fact that SEPTA could not financially afford" to so contract). (In fact, just months earlier, the SEPTA Board had decided precisely the opposite: that SEPTA had little choice but to contract with Amtrak Commuter, *see infra* note 20.) Therefore, even on defendants' view, SEPTA, although presented with the opportunity to contract with Amtrak Commuter, and although it legally could have done so, rejected this option. That is to say, SEPTA, quite literally, "could have contracted with Amtrak Commuter for the provision of commuter service but ... elected to operate directly its own commuter service." No language in § 581(c)(5) compels the perverse conclusion urged by defendants that a commuter authority, lacking the financial resources to contract with Amtrak Commuter, for this reasons *loses* a tax exemption.

■ In sum, I am not persuaded that Congress intended that the applicability of § 581(c)(5) turn on a subjective—and ultimately unverifiable—*ex post* judicial determination as to whether it was financially feasible for any given commuter authority to contract with Amtrak Commuter, where such determination would, at the least, require a parsing of the particular finances of each commuter authority relying on § 581(c)(5).[20]

---

**20.** Were financial feasibility the issue, this fact-based inquiry could not be resolved by reliance on mere announcements of financial "impossibility." It is true, as defendants point out, that Mr. Thompson testified that at the September 1992 meeting "[t]here was unanimity among the members present that it would have been financially impossible for SEPTA to do anything but take over and operate the commuter rail system itself." Lower Merion's Mot. in Sup., Exh. C at 14 (as amended by attached affidavit of Mr. Thompson at ¶ 1). However, according to the minutes of the March 24, 1982 meeting—at which the

Board expressed its intention to contract with Amtrak Commuter—various Board members, including Mr. Thompson himself, described in similar terms the necessity of doing precisely the opposite: contracting with Amtrak Commuter. *See* Lower Merion's Mot. in Sup., Exh. C. (entitled SEPTA Exhibit 1) ("Mr. Thompson, as Chairman of the Railroad Committee, said that he agreed that SEPTA had "little choice but to go with AMTRAK commuter."); *id.* (Mr. Girard-diCarlo said "that certain circumstances have occurred which, in his judgment, make it very difficult, if not impossible for SEPTA to proceed

Therefore, because SEPTA was presented with the option of contracting with Amtrak Commuter, and had the legal opportunity to do so, but ended up operating commuter service directly, it is covered by § 581(c)(5).

B. "Taxes or Other Fees"

■ In *Amtrak I*, the Third Circuit determined that a special assessment on Amtrak to finance the replacement of a highway bridge traversing Amtrak's railway lines was a "tax or other fee" within the meaning of § 546b and hence precluded by that legislation. Section 581(c)(5), as we have already seen, confers a tax immunity on commuter authorities like SEPTA "to the same extent as" Amtrak. As their last line of attack, the defendant townships present a number of arguments as to why the bridge-maintenance costs in these cases are not "taxes or other fees" within the meaning of § 581(c)(5).[21] Many of these arguments were addressed in my previous opinion, wherein I concluded that, "just as the imposition of an assessment on Amtrak to finance the reconstruction of a bridge running over its tracks is a 'tax or other fee' under § 546b, so the allocation of maintenance responsibilities for the four bridges in question is—'to the same extent'—

a 'tax or other fee' within the meaning of § 581(c)(5)." 802 F.Supp. at 1281 (footnote omitted). Hence, all attempts now to distinguish the costs in these cases from those imposed on Amtrak in *Amtrak I* fail.

Lower Merion posits that the costs assessed against SEPTA with respect to the Montgomery Avenue Bridge differ from the costs assessed against Amtrak in *Amtrak I* because, unlike Amtrak, "SEPTA derives a benefit from the existence of the Montgomery Avenue Bridge through the safe operation of trains under a roadway without any grade crossing." Lower Merion's Resp. to SEPTA's Mot. in Sup. at 3. Therefore, Lower Merion concludes that so long as the costs assessed to SEPTA do not exceed the benefits supplied to it, there has been no tax imposed on SEPTA. However, Lower Merion fails to explain why the maintenance of an overhead highway bridge benefits SEPTA any more than a reconstructed bridge traversing Amtrak's railway lines (designed to provide for both overhead vehicular and pedestrian traffic, *see National Railroad Passenger Corp. v. Commonwealth of Pennsylvania*, 665 F.Supp. 402, 404 (E.D.Pa.1987)) stood to benefit Amtrak in *Amtrak I*.[22] In

on its own."). This shift from the near impossibility of one option to the virtual impossibility of the other neatly demonstrates that what is "possible" is a fairly fluid—if not ineffable—concept, not lightly made a prerequisite of legal entitlement.

21. The PUC does not, at least in any of its submissions at the summary-judgment stage, dispute that the costs in question are "taxes or other fees."

22. Lower Merion urges two differences, neither of which, it seems to me, has much to do with comparative benefits. Lower Merion argues, first, that "[b]y contrast to the bridge in *Amtrak I*, the [Montgomery Avenue] Bridge is an existing overhead highway bridge that was reconstructed at no cost to SEPTA or SEPTA's predecessor." Lower Merion's Mem. in Sup. at 20. It is difficult to see why SEPTA benefits more from the existence of a bridge whose reconstruction it did not pay for than Amtrak benefits from the reconstruction and maintenance of a replacement bridge toward which, as a result of *Amtrak I*, it was not required to contribute. (Moreover, the district court in *Amtrak I* noted that the bridge, built in 1899–1900 by the Pennsylvania Railroad Company, "was maintained by Pennsylvania Railroad in the past. Amtrak, the present owner

of the tracks, has not maintained the bridge on its own." 665 F.Supp. at 404.)

Second, Lower Merion argues that, unlike in *Amtrak I* (where a Commonwealth fund reimbursed the Township for costs imposed on it for reconstructing the bridge), there is no suggestion that state monies will be used to finance maintenance of the Montgomery Avenue bridge. Lower Merion thinks that this should make a difference because the Third Circuit in *Amtrak I* indicated that, due to *Illinois Central R.R. v. City of Decatur*, 147 U.S. 190, 13 S.Ct. 293, 37 L.Ed. 132 (1893), whether "expenditures for local improvements are financed solely by municipalities without assistance from the state legislature may be an element in determining whether special assessments qualify as a tax." 848 F.2d at 439. However, the Third Circuit went on to hold that, because § 546b must be liberally construed given Amtrak's federal ties and Congress' broad intention, the distinction between state and local funding "is not implicated here." 848 F.2d at 440. Because SEPTA is exempt "to the same extent as" Amtrak, the distinction, similarly, is not relevant in the instant cases. Besides, as SEPTA points out, any attempt to draw a distinction between "state" taxes and "local" taxes on the strength of *Illinois Central* must deal with the fact that, in *Illinois Central*, the railroad was

any event, even assuming that allocation of costs to SEPTA, unlike those allocated to Amtrak, tracks the benefits received, the district court in *Amtrak I* expressly rejected the proposition now urged by Lower Merion: that insofar as costs imposed upon a property owner are designed to offset special benefits received from local improvements—i.e. if the cost is a "special assessment" (not a "general tax")—then no "tax or other fee" has been imposed. *See* 665 F.Supp. at 410 (noting that the general definition of the term "tax"—a forced contribution of wealth to meet public needs—"contains no basis for distinguishing between a general tax and a special assessment, nor would any reasonable common understanding of the term in the context of this statute").[23] The Third Circuit agreed that "taxes or other fees" extends to assessments for local improvements. Noting that an exemption from taxation usually does not apply to such special assessments, the court decided that the intention of the legislative body must govern, and, in § 546b, Congress plainly intended to confer a broad "user fee" on state and local governments.

---

exempt merely "from all taxation under the laws of th[e] state," 147 U.S. at 190, 13 S.Ct. at 293, whereas, under § 546b and § 581(c)(5), the exemption covers "taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority...."

Defendant Upper Gwynedd—which, unlike Lower Merion, does not expressly argue that a "tax" is imposed only so far as the costs outstrip the benefit received—raises a related argument: that SEPTA, as the owner of the Swedesford road bridge, "should be allocated the responsibilities that go with it as they do enjoy the benefits derived from it." Upper Gwynedd's Mem. in Sup. at 10. In my previous opinion denying defendants' motions to dismiss for lack of subject-matter jurisdiction and/or for failure to state a claim, I opined that the mere fact that a party has been held to own the bridge does not dispose of the question whether a "tax or other fee" is imposed when the owner is compelled to maintain that bridge. There I wrote:

> A second possible factual difference [between the costs levied on SEPTA and on Amtrak] is that, with regard to three of the four bridges involved in the instant consolidated cases, the PUC made a formal finding that SEPTA owned the structure. The PUC concluded that the conveyance of the rights-of-way included, with it, ownership of the overhanging structures. While this pronouncement of ownership may deserve res judicata effect on that particular issue, *see National R.R. Passenger Corp.*, 665 F.Supp. at 407, it is another "distinction without a difference" for purposes of § 581(c)(5). In *Amtrak I*, the district court determined, and the Third Circuit affirmed, that the allocation of bridge replacement costs was a "tax or other fee" without considering the question of ownership of the bridge or future ownership of the reconstructed bridge. The absence of discussion of bridge ownership suggests that this fact was not relevant to a characterization of the fee in question. (Indeed, the PUC itself, even in these consolidated cases, has allocated bridge maintenance costs to SEPTA where SEPTA was not the owner of the bridge; instead of stressing ownership of the bridge, the PUC, as in *Amtrak* II, has argued that the responsibility to maintain the bridge runs with ownership of the tracks beneath it.) More-

over, SEPTA—which evidently perceived no net benefit in bridge ownership—opposed any determination that it owned the various bridges. It would be inappropriate to hinge the scope of a federal tax immunity on a formal state declaration lacking any relevant effect on the underlying equities.

802 F.Supp. at 1281 n. 13.

**23.** Certain language in *National Railroad Passenger Corporation v. Pennsylvania*, No. Civ. A. 86–8357, 1991 WL 998 (E.D.Pa. Jan. 2, 1991) (*Amtrak II*), does not disturb my conclusion that the district court in *Amtrak I* determined that an entity is subject to a "tax or other fee" within the meaning of § 546b even if the exaction is designed to offset a benefit from local improvement. In *Amtrak II*—where the district court was asked to enforce its order in *Amtrak I* enjoining the PUC from assessing Amtrak for maintenance costs of the subject bridge—the question was whether the order in *Amtrak I* precluded the PUC not only from imposing an assessment on SEPTA for construction of a new bridge (the proposed course in *Amtrak I*), but also from imposing an assessment for maintenance of the existing bridge (the PUC having decide to repair rather than replace the existing bridge). The court decided that both "special assessments" violated § 546b and the court's previous order. The court then went on to note that Amtrak would derive no benefit from maintaining the existing bridge (which apparently was now purely designed for pedestrian traffic) and Amtrak should not have to foot the bill for entirely local concerns. *See* 1991 WL 998 at *2–3. I do not read this discussion, suggesting that Amtrak should not be forced to pay for local concerns from which it does not benefit, to embrace the inverse proposition: that, consistently with § 546b, Amtrak can be compelled to pay for local improvements provided it benefits from them. Such a rule, it seems to me, would flatly contradict the articulated position of the district court in *Amtrak I* that "special assessments"—which are imposed precisely on the assumption that a particular entity *has* received particular benefits from a given local improvement—are also "taxes or other fees."

The court concluded, "It would be manifestly inconsistent with that design to make Amtrak pay for related local improvements in the many instances where the states could, and would, impose them." 848 F.2d at 440. It is true that the Third Circuit liberally construed Amtrak's tax exemption in part because of Amtrak's federal ties and the rule that the federal government's tax immunity is broadly interpreted. Although, as defendants repeatedly stress, SEPTA does not share Amtrak's quasi-federal status, it does, by virtue of § 581(c)(5)'s plain language, share Amtrak's tax exemption;[24] therefore, there is simply no warrant for construing the "taxes or other fees" covered by § 581(c)(5) more narrowly than those covered by § 546b due to a difference in status that Congress saw fit to ignore. Therefore, I remain convinced that the costs in question in these consolidated cases are, as a matter of law, "taxes or other fees" under § 581(c)(5).

## V.

### Conclusion

Section 581(c)(5)—a constitutional exercise of Congress' commerce power—entitles local commuter authorities that could have contracted with Amtrak Commuter for provision of commuter service but elected to provide that service themselves to the same tax exemption afforded Amtrak and Amtrak Commuter. SEPTA, which proceeded to operate its own commuter rail service instead of contracting with Amtrak Commuter for provision of that service, has a tax-exempt status under § 581(c)(5). Because Amtrak's tax exemption has been interpreted to extend to assessments for maintaining or improving bridge structures that pass over Amtrak's railway lines, and because there is no basis for concluding that SEPTA is entitled to a lesser immunity from the similar assessments in these cases, the PUC will be enjoined from allocating such costs against SEPTA with respect to the four subject bridges that pass over SEPTA's railway lines.

An appropriate order follows.

### ORDER

For the reasons given in the accompanying opinion, it is hereby ORDERED and DIRECTED that:

1. the motions for summary judgment submitted by defendants Public Utility Commission, Township of Lower Merion, and Township of Upper Gwynedd are DENIED;

2. the motions for summary judgment submitted by plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") are GRANTED, and judgment is entered in favor of SEPTA with respect to each of these three consolidated cases;

3. any assignment of costs to SEPTA, by order of defendant Pennsylvania Public Utility Commission ("PUC") for costs associated with design, construction, maintenance, inspection, or repair of

 a. the Montgomery Avenue bridge structure, substructure or associated stairway as identified in the PUC Opinion and Order entered December 10, 1991;

 b. the Swedesford Road bridge structure, substructure or superstructure as identified in the PUC Opinion and Order adopted July 16, 1991 and entered January 21, 1992, and

 c. the Johnson Avenue and the Willow Grove Avenue bridge structures as identified in the PUC Opinions and Orders issued June 2, 1992,

violates 45 U.S.C. §§ 581(c)(5) and 546b as a tax or other fee levied upon SEPTA; and

4. defendants are permanently enjoined from assessing such tax or other fee regard-

---

**24.** In fact, Amtrak's tax exemption was broadly construed partly because, as the Third Circuit observed, a House Report accompanying § 546b indicated that Amtrak was to be exempted from all state and local taxes " 'to the same extent as the United States is exempt.' " 848 F.2d at 440 (citation omitted). By the same token—and even more so when the asserted equivalence is part of the text of the statute itself—SEPTA is entitled to the same broad tax immunity as Amtrak because, by virtue of § 581(c)(5), it is exempt "to the same extent as" Amtrak.

ing the foregoing bridges, or enforcing the foregoing orders of the PUC against SEPTA.